## BALTIMORE & BOSTON BARGE CO. v. KNICKERBOCKER STEAM TOWAGE CO.

(District Court, D. Maine. February 21, 1908.)

### No. 41.

1. TOWAGE—INJURY TO TOW—LIABILITY OF TUG FOR WANT OF PROPER SKILL.

Where the master, in charge of the operations of two tugs engaged to tow a loaded barge down the Kennebec river, at the request of the master of the barge delayed starting until the tide had passed the most favorable stage, and also placed the tugs alongside on either quarter of the barge, although he had never towed down the river in that way before and disapproved of it, he became responsible for such method, in the absence of an agreement to the contrary, and bound to the exercise of reasonable care and skill; and the tug owner was liable for a grounding of the barge through improper handling by the tugs, due to the failure to appreciate the effect of the currents on a tow so made up, although, if they had been allowed to tow in the usual way, the injury would probably have been avoided.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 15.]

2. SAME.

Evidence considered, and held insufficient to sustain an allegation that the injury of a barge by striking some rocks outside the channel while being towed by two tugs down the Kennebec river was due to any negligence or want of skill on the part of the tugs, which were towing in the customary manner and kept the channel, but rather to show that the sheering of the barge was despite the efforts of the tugs to prevent it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 36.]

In Admiralty.

Edward C. Plummer, for libelant.
Benj. Thompson, for respondent.

HALE, District Judge. This libel in personam is brought to recover damages sustained June 3, 1906, by the libelant's barge Jeannie, while being towed down the Kennebec river by the respondent's steam tugs Perry and Seguin; also to recover damages sustained August 21, 1906, by the libelant's barge Emilie, while being towed down the Kennebec river by the respondent's steam tugs Seguin and Charlie Lawrence.

1. The facts relating to the injury to the Jeannie are substantially as follows: The barge Jeannie is a whaleback barge, about 265 feet in length, 26 feet beam, and drawing at the time of her injury 13 feet forward and 13.3 feet aft. The respondent company is the owner of a large fleet of steam tugs, and has been engaged in the towage business on the Kennebec river for many years. The testimony tends to show that, during the season, it generally tows about 3,000 vessels. The steam tug Perry is a vessel of 107 gross tons and is equipped with engines which develop about 400 horse power. At the time of the injury she was in command of Capt. Frank Dingley, who has had large experience as master of steam tugs on the Kennebec river. The steam tug Seguin is a vessel of 98 gross tons, built at Bath especially for Kennebec towage. She has condensing engines which develop about 400 horse power. At the time of the injury she was in command of Capt. Alfred H. Hogan, who has been master of steam tugs for many years; his experience being mainly upon the Kennebec river. The Kennebec river is a tidal river, upon which, for many years, there has been a large amount of navigation. Nearly all vessels tow on the river. With reference to the passage where the injury happened at Thorn's Head, 20 miles below Pittston, the place of starting, and only 3 or 4 miles above Bath, the testimony and the chart show that in going down the river vessels of 12 feet draft and upwards are obliged to make a turn to port of about three points in a distance of somewhat less than half a mile, and in that space there are several currents setting in different directions, due to the two branches of the river, through which the tide ebbs and flows, and due, also, to the location of islands and shoals. On the ebb tide the current sets out of Whiskeag creek and by Thorn's Head, where these currents come together. A black buoy marks a ledge which is passed on the starboard hand going down the river. A red buoy marks the sand spit a little below and on the opposite side of the river. In order to pass these places in safety it is necessary for a vessel to pass the black buoy close aboard and then swing sharply to port in order to pass between Thorn's Head and the red buoy. The general tendency of the ebb tide coming out of the Whiskeag Narrows is to set a vessel off from Thorn's Head. There is testimony that a vessel was never before known to strike on Thorn's Head.

On Saturday, June 2, 1906, the barge Jeannie completed her loading at the Independent ice house at Pittston. She had on board 2,345 tons of ice, and was drawing 13 feet forward and 13.3 feet aft. She was under the command of Capt. Herbert W. Jellison, a master mariner of 20 years' experience. Mr. Haley, the superintendent of the American Ice Company at that point, notified the respondent that the barge was ready for sea. Capt. Dingley, the agent of the towboat company at Bath, gave directions for the two steam tugs, Perry and Seguin, to go to the Jeannie on Sunday morning for the purpose of towing her to the mouth of the Kennebec river. Pursuant to this order, the Perry, in command of Capt. Frank Dingley, proceeded to Swan's Island on Sunday morning. From that point he towed the schooner Hattie to the Independent ice house at Pittston, anchored her in the river, and then went alongside of the Jeannie, which was

headed up river with her starboard bow against the wharf. The Perry then made fast to the port side of the Jeannie about 8 o'clock. At this time the other tug had not arrived. There is testimony of certain conversation between Capt. Dingley of the Perry and Capt. Jellison of the barge with reference to starting down river. About 10 o'clock the second tug was observed coming up river. The Jeannie was then started from the wharf; and the Seguin, in charge of Capt. Hogan, assisted in winding her. While the Perry was waiting alongside the Jeannie, Capt Dingley of the Perry and Capt. Jellison, the master of the barge, had some talk as to the character of the river and the manner in which the tugs should tow the barge. Upon their conversation I shall comment later. After the barge was turned, the Seguin made fast on the starboard quarter. About 10:20 the tugs started with the barge down river, the tide having fallen several inches. The tugs proceeded down river until they reached the vicinity of Thorn's Head, some 20 miles below Pittston. The tide at this point runs ebb nearly two hours earlier than at Pittston. While passing Thorn's Head, the snout or bow of the Jeannie struck the shore in practically a direct line down the river. She was considerably damaged below the water line, but immediately came off the ledge. The Seguin took a short hawser ahead, the Perry made fast again to the port quarter, and thus they towed the barge to Bath. The foregoing statement of the facts is, I think, without conflict.

There is a conflict in testimony as to what the talk was between Capt. Dingley and Capt. Jellison in reference to the manner in which the tugs should tow the barge. Capt. Jellison of the barge testifies:

"We had the tug Perry tied up on our port quarter and the tug Seguin was tied up on our starboard quarter.

"Q. By whose orders did they assume those positions, so far as you know? "A. By their own. They had no orders from me. They placed them there at their own option."

Capt. Dingley, the master of the Perry, testifies that he arrived at the Jeannie at 8 o'clock on Sunday morning; that she was then headed up river, with her starboard side against the wharf; that he went on the port quarter, threw a line out at each end, and said to Capt. Jellison:

"Take in your lines and we will start you down."

Capt. Dingley testifies as to his conversation with Capt. Jellison as follows:

"He [Capt. Jellison] says: 'Where's the other boat? I'm going to have two boats.' I says, 'She will be right along.' 'Well,' he says, 'we will wait until he comes.' I says, 'Captain, let us start you along,' and he says, 'Not until the other boat comes.' He says, 'How are you going to tow me?' and I says, 'With one boat alongside and one ahead,' and he says, 'No; I am going to tow with a boat on each side.' I says: 'Captain, you had better let us tow you that way. We can handle you better.' But he says, 'I want a boat on each side.' I says, 'Captain, usually when strangers come here, we generally handle them our own way.' 'Well,' he says, 'you are going to handle me my way.' I says, 'If we handle you your way, you ought to be responsible if you have the say about it.' I says, 'When we handle them our way, we assume the responsibility; but when we don't, we do not.' He says, 'You are going to tow me with a boat on each side.'

I says, 'You're the doctor, but,' I says, 'let me start you before the tide gets to hawsing.' I says, 'It is about high water.' He says, 'Wait until the other boat comes.' I says, 'The boat was ready to start about the same ·time and she was taking a boat away from Murdock's, and I was expecting her every minute.' While we were talking, Mr. Haley says, 'There she comes now.' I took my glasses and looked, but it was not the Delia; it was the Seguin. I says: 'Captain, here comes the boat now. Let us take in our lines and get started.' So he did, and we got half swung round when the Seguin got there.

"Q. Now, Captain, ·when you first had this talk with him, which was when you first reached the barge, what was the state of the tide? A. Very near high water.

"Q. You say about what time you came alongside of him? A. We left the barge about 8 o'clock.

"Q. Did he say at that time anything with reference to whose orders he was acting under about having a tug on each side? A. Yes; his people's.

"Q. What did he say about his people? A. He said his people ordered him to have two tugs; he was to have two tugs.

"Q. Did he say how the tugs were to tow him? A. He didn't say anything about having been ordered as to how the tugs was to tow him.

"Q. What did you say to him when he said he was going to have a tug on each side? A. I told him it was an awkward way.

"Q. Anything about what effect it would have to have a tug on each side? A. He says they docked me with boats on either side.

"Q. What reply did you make to that? A. I says, 'Certainly, Captain, that is the only way they can do.' 'But,' I says, 'we go down a shoal river, and we have to cross the tides at some points, and a boat alongside cannot do as well as a boat with a hawser over the bow.'

"Q. Did you tell him what advantage the hawser over the bow would have about swinging her? A. I told him we could swing much better with a hawser over the bow than he could alongside.

"Q. Anything said as to whether you ever towed with a boat on each quarter on the river? A. I says, 'We never towed a vessel down the river that way before.' "

## Later in the examination, Capt. Dingley further testifies:

"The Seguin came up around his bow. His bow was off. He lay diagonally across the river, swinging very slowly. The Seguin came up and says, 'Where do you want me; a hawser ahead?'

"Q. What reply was made? A. 'Alongside.'

"Q. Who said that? A. It was asked a second time, and nobody answered the second time. The second time, I says, 'The captain says he wants you alongside.'

"Q. And what did the Seguin then do? A. Made fast alongside.

"Q. Whereabouts? A. On the starboard quarter.

"Q. And then you started down the river, did you? A. We did.

"Q. When ·you got started down the river, at the time you started down the river, what time was it? A. Just as we got swung round, the church bells rung at South Gardiner, and I looked at my clock and it was 20 minutes past 10.

"Q. Then as you went down the river did your boat continue on the port side and the Seguin on the starboard? A. Yes, sir.

"Q. And when you got straight down the river what did you do about going full speed ahead? A. We went full speed ahead where the river was straight and good, and when we came to the turns we would slow up or back, as the case would be, whichever way we would turn.

"Q. Make the turns all right? A. Yes; made the turns all right; a little slow at one or two.

"Q. How did the barge appear to answer her helm? A. Slowly.

"Q. But she did respond, did she? A. She did."

This was the first trip that Capt. Jellison had ever made upon the river. No disaster occurred until the arrival at the black buoy, half

a mile to the westward of Thorn's Head. The testimony shows that, when the barge had gotten sufficiently far beyond the black buoy to make the turn, the wheels on both the tugs and the barge were starboarded. At some time after this the engines of the Perry on the port side of the barge were reversed. Capt. Dingley of the Perry had charge of the tow. The barge then, with the tugs on either side, began to swing to port. The Seguin on the starboard side was going ahead, while the Perry on the port side was backing, which tended to swing the tow to port. But somewhere after passing the black buoy the Seguin ceased to work its engines forward and began to back. There is some indefiniteness as to the precise point at which the Seguin began to back. It is claimed by the libelant that if she had continued to go forward, leaving the Perry, on the port side to continue to back, the turn would have been properly made, and Thorn's Head would have been passed in safety. The testimony convinces me that the barge was under the control of the tugs. I do not find anything to persuade me that she did anything to prevent the tugs from exercising complete control and dominion over her. It is clear that they did not successfully pass Thorn's Head. Capt. Jellison of the barge testifies that he does not know why the Seguin backed; that Capt. Dingley of the Perry did not know; and that, soon after the accident, Capt. Dingley said that if the Seguin had not backed he would have made the turn.

The respondent insists that if the tugs had been attached to the tow in the manner first designated by Capt. Dingley, namely, one forward on a short hawser and the other on the port side, the towage service would have been successfully performed; that in fact it could readily have been performed with one tug forward on a short hawser, and without the aid of a second tug. The testimony on the part of the respondent is that Capt. Jellison insisted upon having the barge towed with a tug upon either side of her, and that, with great reluctance, Capt. Dingley towed her in this way. But the testimony falls short of proving an agreement on the part of the libelant to bear the responsibility of this method of towage. The tugboats were not common carriers. When Capt. Dingley found that he was unable to convince Capt. Jellison that the latter's method of towing was open to serious objection, Capt. Dingley had the right to refuse the towage service. If the delay occasioned by the protracted conversation had made it too late to start down the river that day, he had the right to delay the towage service until the following day, when an earlier start could have been made.

In the case of The Naos (D. C.) 144 Fed. 292, 299, this court held that the captain of a tugboat was in fault in starting at too late an hour, "even if he was urged to this delay by the charterer."

In the case at bar, Capt. Dingley adopted this method of towage without obtaining Capt. Jellison's assent to assuming the responsibility for it. As to the effect of such assumption of responsibility, if there had been any, it is not necessary for me to consider. Capt. Dingley testifies that he had never towed barges in this way before; and he now says that if he had towed the barge in the method which he had suggested he could have done it successfully. But, having adopted this method of performing the towage service when he had the

right to decline it, he must be held to the use of the reasonable skill of a prudent mariner in conducting the towage after this method.

In The Margaret, 94 U. S. 494, 24 L. Ed. 146, in speaking for the Supreme Court, Mr. Justice Swayne held that, although the steam tug performing the towage service was not a common carrier, nor an insurer, it was bound to exercise reasonable skill and care in every particular relating to the work until it was accomplished; that she was bound to know the channel of her home port, and whether, under all the circumstances, it was safe and proper to attempt to perform the towage service; and that if what occurred was inevitable the tug should have forecast it and have refused to proceed.

In Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477, the Supreme Court held that, as a necessary incident to the engagement, the tug assumed supreme control of the tow. In speaking for the court, Mr. Justice Hunt said:

"When the master of a tug undertakes to transport a barge he must apply the means for that purpose. He must furnish the motive power not only, but he must direct her location, whether on the port or the starboard side, whether she shall be the inside boat or the outside boat, when and how she shall be lashed to other boats; * * * and what shall be her course of navigation."

In The Garden City, 127 Fed. 298, 62 C. C. A. 182, it was held by the Court of Appeals for the Sixth Circuit that the master of a tug is bound to possess such degree of skill and judgment for the protection of his tow as might fairly be expected from a man of his calling under all the circumstances in which he is placed.

In Winslow v. Thompson, 134 Fed. 546, 67 C. C. A. 470, it was held by the Court of Appeals in this circuit that the tug is bound, first, to know the condition of the channels and other waters where she assumes to tow.

In Schuyler v. Tillyer (C. C.) 41 Fed. 477, it was held by the Circuit Court, Eastern Pennsylvania District, that, while the tug did not stipulate for the absolute safety of the schooner, yet she was bound to meet such requirements of her service as would enable her to render it with safety to the schooner. She must know the depths of water in the channel, the obstructions that exist in it, the state of the tides, the proper time of entering upon her service and, generally, all the conditions which are essential to the safe performance of her undertaking. In that case, the court said:

"If she failed in any of these requirements, or in the exercise of adequate skill or care, she is justly subject to an imputation of negligence."

In the case of The Florence (D. C.) 88 Fed. 302, Judge Coxe, sitting in the District Court, held that it was the duty of the master of a tug to see that the tow is properly made up, and that he must know the conditions of the river, the width of the channel, and the effect of the tide; that he is the pilot of the voyage, and responsible for the navigation of both vessels.

In the case of The Deer, Fed. Cas. No. 3,737, Judge Blatchford says:

"The fact that the existence of the sunken pier was known to those navigating the steamboat makes the running of the barge upon it conclusive evidence

of negligence, under the circumstances, in the absence of proof of any vis major."

In Thompson v. Winslow (D. C.) 128 Fed. 73, this court quoted these words of Judge Webb in an unpublished opinion:

"The slightest departure from the highest skill and care is almost certain to be attended with loss, and, although the mere fact of trouble raises no presumption of fault, it does call for the sharpest scrutiny of all the attending circumstances."

In The Somers N. Smith (D. C.) 120 Fed. 572, this court quoted Judge Fox:

"Knowing * * * all these dangers, * * * a much higher degree of skill, care, and attention is demanded of him [the master of the tug] than if he had undertaken the same movement under circumstances free from danger."

Moore v. The C. P. Morey, Fed. Cas. No. 9,756, has been called to my attention as a controlling authority. In that case a tug took in tow a schooner and was furnished by the schooner with a frozen towline. The tug asked for a better line. She was told, substantially, to do the best she could with the frozen line. Judge Blatchford held that she did the best she could with it, and there her duty terminated; and he held that the tug was not in fault for any difficulties arising in consequence of the use of the line, provided it was used with reasonable care.

Goodwin v. The C. Durant, Fed Cas. No. 5,552, has also been called to my attention. In that case the tug acted in pursuance of the directions of the libelant, and of the pilot placed in control by the libelant. The action was in contract. The court held that the respondent had not broken the contract of towage.

In the case at bar the respondent cannot be held as an insurer. The fact that there was an injury is not sufficient to find the respondent in fault. It must be held to the use of the reasonable care exercised by ordinarily prudent mariners under all the circumstances. In The Niagara (D. C.) 20 Fed. 153, Judge Addison Brown held this "reasonable care" to be "such due care and diligence in handling the tow as a man of ordinary precaution would exercise in the preservation of his own property."

Did the respondent use such care in this towage service? The fact that Capt. Dingley never had towed in this way before, and that he says he was unwilling to do so, are facts that suggest a very close scrutiny into the details of his actual performance of the towage service. Was he in the exercise of such skill as prudent mariners employ when towing a barge with a tug made fast to either quarter? The fact that he was averse to this method of towage does not excuse him from the exercise of reasonable care in performing it. The fact that he knew enough about the dangers of this method of performing the towage service to warn the barge is not conclusive on the question whether he competently knew the condition of the channels and the effect of the tides upon a barge towed with a tug on either quarter, within the meaning of the first proposition of Winslow v. Thompson, supra. The evidence persuades me that he did not un-

til too·late, discover the effect of the current upon his tow.. He had been accustomed to another method of towage. He was not familiar with the construction of the Jeannie. He did not, I think, appreciate the effect of the current upon a whaleback barge with a large overhang forward. I have already referred to much of the testimony, but not to all of it. The whole testimony, taken together, leads me to the belief that he did not have the necessary experience or skill in that particular method of towage; and I am persuaded that the injury resulted from this cause. After a full examination of the evidence, I am of the opinion that the captain in command of the tugs failed in the exercise of reasonable care in manœuvring one or both tugs; that he failed in judgment as to the time to back the Seguin on the starboard side; that he was also guilty of a fault alleged in the libel, in that he failed to back the steam tug Perry on the port side in time to swing the barge. I think his error in seamanship resulted from the fact that he did not realize the effect of the current upon the barge with a tug made fast upon either quarter. There is no evidence which persuades me that, upon the day of the injury, there was any unusual swiftness in any current, or that the barge was in fault.

In Hall v. Little, Fed. Cas. No. 5,939, it was held that steamers. which navigate in a channel with which they are familiar must be held to a knowledge of the currents incident to the state of the water, and they must be held responsible if they allow themselves to be driven by such current to the infliction of an injury.

In The Granite State, 70 U. S. 310, 18 L. Ed. 179, the Supreme Court held that where a vessel had the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her, the court is not called upon to inquire as to the precise detail wherein the steamer was not managed with nautical skill.

In the case before me it is not necessary to decide which fault in seamanship produced the disaster; nor is it necessary to decide whether the libelant is correct in its testimony that this peculiar method of towing was adopted at the option of the respondent, or whether it was a service urged upon it, as its testimony indicates. The master in control of the tugs adopted a certain method of towage, which he was not at law or in fact compelled to adopt. In the carrying out of such service he must be held to the reasonable care of a prudent mariner.

This case does not present the question which came before the court in Moore v. The C. P. Morey, supra. I have already stated the decision in that case. In the case at bar I will assume, for the purpose of comparison of the two cases, that Capt. Dingley is wholly correct in his statement that the method of towage was urged upon him and that he adopted it reluctantly. I have found that, not being a common carrier, he had the right to refuse such towage service, and that, as a. matter of fact, having adopted this method of towage, he did not perform it with the reasonable skill to be expected of a prudent mariner. In other words, I have found that he did not "do the best he could under all the circumstances of the case."

Goodwin v. The C. Durant, supra, does not present a case in point. In that case the action was in contract, and the court held that the respondent had not been shown to have broken the contract, in that it

acted in pursuance of the directions of the libelant and of the pilot who was placed in control by the libelant.

In the case at bar the tugs had full control. Whatever fault there was in seamanship in coming around the turn was the fault of the tugs and not of the barge. The testimony is indefinite; but it is sufficient to convince me that if Capt. Dingley had caused the Perry on the port side to begin backing at the proper time, and if the Seguin had continued to go ahead, the movement of the vessels to port would have been sufficient to escape Thorn's Head, and to make the turn successfully.

I am, therefore, of the opinion that, in the case of the injury to the Jeannie, the respondent did not, in its towage service, exercise the degree of skill and care that might be fairly expected of a prudent mariner under the circumstances. I hold that the respondent was in fault, and that the injury happened solely on account of the fault of the respondent.

2. The facts relating to the injury to the Emilie are, in substance, as follows: The barge Emilie is a vessel of 1,069 gross tons, 216 feet long, 35 feet beam, and at the time of her injury was drawing 15 feet 6 inches forward and aft. On August 21, 1906, she completed her loading of ice at Pittston. About 12 o'clock the steam tug Charlie Lawrence, in command of Capt. Blanchard, started her from the wharf and carried her into the stream. The tide was then flowing. Half an hour later the steam tug Seguin arrived in command of Capt. Hogan. The tugs waited nearly an hour before starting, so as to start before high water. The Seguin took a hawser about 20 fathoms in length through the bow chock. The Lawrence was made fast on the port quarter to help steer. At the time of starting and during the towage service the wind was light from the eastward, and the weather was clear. The tugs proceeded down the river. Capt. Blanchard of the Lawrence was standing on the port side of the bridge of the barge forward of the pilot house, while his mate was standing at the wheel of the tug. Capt. Nordell and the assistant engineer were at the wheel of the barge. Capt. Blanchard gave the captain of the barge orders to follow the Seguin. The tugs with their tow proceeded for about three-quarters of an hour under one bell, giving a speed of 2½ or 3 miles, as estimated by Capt. Blanchard, and 5 knots, as estimated by Capt. Nordell. When in the vicinity of Goodwin's Point, off the southern end of Nehumkeag Island, the barge dragged across a point of rocks, striking a glancing clip and sliding by. The alleged fault in towage is that the barge "was towed violently upon some rock or ledge at or near Goodwin's Point," and, further, that the damages and injuries sustained were caused wholly by the negligence and unskillfulness of defendant, its servants and agents controlling the tugs, "in not following the safe channel of said river, instead of towing said barge upon the rocks or ledge aforesaid, and, further, laying a course so near said submerged rocks at Goodwin's Point as to cause a vessel of the size and capacity of libelant's barge, heavily laden, to strike upon said submerged rocks."

Capt. Nordell, the master of the barge, a mariner of experience, testifies that he was never on the river before; that the Seguin was

made fast with the usual length of hawser to swing the vessel quickly; that he received his orders from Capt. Blanchard, who remained on the Emilie's bridge during the towage service, and that these directions were to follow the Seguin; that the two tugs gave the Emilie a speed of about 5 knots through the water; that within a distance of about a mile the Seguin was on both the port and starboard bows of the barge, which Capt. Nordell then supposed was due to the crooked channel; that when near Hawthorn's Rock, the place of the injury, the Seguin cut right across the Emilie's bow to starboard, and that Capt. Blanchard called to Capt. Nordell to port his wheel; that Capt. Nordell followed the Seguin as near as he could; that she sheered a little to port and then sometimes to starboard, although these sheers were not more than one point; that he supposed these sheers were caused by the Seguin following the channel; and that he supposed the channel was crooked.

Capt. Blanchard, who was in charge of the towage service, has been engaged in service on the Kennebec river for 42 or 43 years, and had been master of the Charlie Lawrence for 24 years. He testifies that he is familiar with the waters at Nehumkeag Island, had sounded there every year, and had not observed any change; that the channel at that point is scant 100 feet in width, and that it carries a depth of 17 feet; that such draft is sufficient to tow a barge of the Emilie's size; that at the time of the towage service he supposed the Emilie was drawing 16 feet, when, as a matter of fact, she was only drawing 15 feet 6 inches, both forward and aft; that he asked Capt. Nordell about the steering of the barge, and that the latter said she did not steer very well; that he told Capt. Nordell that he would have to steer pretty fine, as the river was crooked and narrow; that they started about an hour before high water; that he does not know of any better way to handle a barge than the method adopted, with a tug ahead on a short hawser and a tug made fast on the port quarter, because with steam tugs, made fast in that way, they can swing back and forth quicker than they can do with a tug on each quarter, and that they are in the habit of towing in this way on the Kennebec river; that in towing down the river they have ranges to run by, so as to tell whether they are in the deep water of the river or not; that he steered by such ranges; that as they came down the river the Seguin followed the ranges, but the barge did not do quite so well; she would vary a little; and when they got to the northern end of Nehumkeag Island, ready to turn, she took a rank and sudden sheer to starboard, towards the island; that he then stopped his tug, which was working under a slow bell; that he reversed his engines and ordered the wheels of the barge and tug to starboard; that the tug's wheel was rolled over quickly; that he thinks the barge sheered toward the island about 3 points from a straight course down the river; that when she sheered the Seguin hauled to port about 3 or 3½ points; that when they checked the sheer to starboard the tug started to go to port, and at that time they were a length or more above the rocks on Goodwin's Point; that the barge made a rank sheer to port about 3 points from a straight course down the river; that he then ordered his boat to come ahead under a hard-aport wheel, which would tend to twist her off; that at that time

the Seguin was trying to go to starboard, and he ordered the helm of the barge to be ported, but that she did not get over in time; that, when he saw the barge was going to strike, he stopped his boat, as he did not want to give her any more headway to cause her to strike too hard; that if he had reversed full speed astern it would have had a tendency to haul the barge's bow to port and get her over still more to the port side; that if she had been 30 feet to the westward she would not have struck; that he could not account for the sudden sheer of the Emilie, unless it might have been that they were going a little bit too strong, or something like that, or might have been making the turn a little quick, but they were not making more than $2\frac{1}{2}$ or 3 miles an hour, and that speed was none too much to give her steerage way. He says, further, that he cannot understand why she took a sheer, and that they were trying to break it. Capt. Hogan testifies that he was in the habit of sounding out the channel to ascertain the depth of water; that the channel between Goodwin's Point and Nehumkeag Island is practically clear; that there is plenty of room for a vessel like the Emilie to go down as she was; that at the time of this towage service there was 18 feet of water at Goodwin's Point and 18 feet or better in the channel; that the channel is about 100 feet wide for a distance up and down the river of three-quarters of a mile; that he gave the Emilie about half speed; that his boat was running under one bell, which was slow for that part of the river; that if the Emilie had followed the course of the Seguin she would have gone clear all right, as the Seguin was at no time out of the deep channel; that up to the time of the injury the Emilie had been following fairly well, but that, he thinks, she sheered to the westward about three points, and he hauled to port to break her starboard sheer; that he then hauled to the westward to steady her, but that the Emilie went about three points to the eastward on her next sheer; that when she was sheering back he watched her, and when he saw her sheer to the eastward he hauled to starboard to break her sheer; that then she dragged the bottom; that by the hawser he did not know she was dragging, but that he learned the fact from the captain of the barge when he got her down to the flats, at the mouth of the river.

I heard the testimony of the witnesses. When they were upon the stand I saw that they had a careful examination. I have considered the whole testimony with care. I cannot find that the libelant has adduced sufficient evidence to sustain the burden that is upon it to prove negligence on the part of the respondent. Clearly it has not sustained the contention in the libel that the tugs were at fault in not following the channel of the river and in towing the barge too near the submerged rocks. It is true that the testimony shows the Emilie some 30 feet outside the channel at the time she struck, and that the burden is thus cast upon the respondent to explain this fact. But the fact is explained by the evidence, to the substance of which I have already referred. The whole evidence convinces me that the divergence from the channel was caused by the sheering of the barge. It does not appear that the sheering was caused by any negligence on the part of the tugs. It does affirmatively appear that the tugs followed the channel closely; that they followed the ranges along the shore. The courts

have repeatedly held that the mere fact of sheering is not sufficient to prove negligence on the part of tugs. Sheering might come from one of many different causes. It is quite as likely to proceed from the fault of the tow as from that of the tug. In the case at bar, whether the sheering resulted from the barge being too full aft, from her steering hard, or from her not answering her helm readily, are matters that the court need not decide. I have quoted the testimony of Capt. Blanchard in reference to the possibility of the tugs "going too strong"; but this remark does not furnish sufficient reason for condemning the tugs, for he further testifies that the speed at that time was not more than barely enough to give steerage way. The fact that the captain in charge of the tow indicated this as a possibility would have been a very suggestive piece of evidence, if I could find that the tugs were, in fact, proceeding rapidly. But the testimony shows the exact contrary. It shows affirmatively that the forward tug was proceeding slowly in the channel, taking care to follow the monuments upon the shore.

In the case of The Lady Wimett (D. C.) 92 Fed. 399, Judge Coxe, sitting in the United States District Court, said:

"The course which the Wimett took was the usual one. * * * When the Niobe encountered the return current near the end of the Erie Basin Pier she took a decided sheer to starboard. The Wimett endeavored to overcome this sheer by every means in her power and would, in all probability, have succeeded had not the chock and cleat given way in succession, leaving the Niobe helplessly adrift. The court has read the entire testimony, having in mind the allegations of fault against the Wimett and is forced to the conclusion that none of them has been established. * * * The Wimett's course was not too close to the breakwater. * * * The Wimett was entirely capable of towing a single canal boat to Buffalo and there is no reliable testimony to the contrary. The line was the ordinary length, and the pretense that a bridle was necessary seems wholly without support."

In The Winnie, 149 Fed. 725, 79 C. C. A. 431, delivering the opinion of the Circuit Court of Appeals, Judge Coxe said:

"The burden was on the libelant to prove fault on the part of the tug; in this he failed. The testimony preponderates overwhelmingly in favor of the claimant to the effect that the tow was made up in the usual way. This being so, we cannot escape the conclusion that liability cannot be predicated of a finding that the tow was made up in an unusual way. The libelant alleged negligence and failed to prove it. It was then the duty of the court to dismiss the libel.

"It is not at all unlikely that the damage was caused by the swells of passing ferryboats, but the court is not called upon to enter the realms of conjecture in an attempt to ascertain how the accident was caused. It is enough for the present cause that the tug did not cause it. * * * The master, according to the great preponderance of proof, exercised the reasonable care, caution and maritime skill required. The tug was not an insurer, and cannot be held liable merely because the Fermoil received an injury while in her custody."

In the case at bar it is unnecessary to decide whether the towage would have been safer in reference to sheering if the unaccustomed method had been pursued of putting a tugboat on either side of the barge. The result in the case of the Jeannie a few weeks before created no presumption in favor of that method of towing; and in the

case of the Emilie I cannot condemn the respondent for not following the method of towing pursued in the case of the Jeannie.

In the matter of the Emilie, I am constrained to find that the libelant has not sustained its contention that the respondent was at fault, either in not following the channel of the river, or in towing the barge too near the submerged rocks, or in any other allegation of its libel. The testimony shows that the tugs were, in fact, following the channel of the river and were not towing too near the submerged rocks. It persuades me that the injury resulted from the sheering of the barge; that this sheering accounts for the barge going out of her course upon the rocks in spite of the efforts of the tugs to break her sheer. In the case of the Emilie, I find that the respondent was not at fault.

The result, then, is that in the matter of the first injury, namely, to the Jeannie on June 3, 1906, I find the respondent at fault. In the case of the injury to the Emilie, on August 21, 1906, I find that the respondent was not at fault.

An interlocutory decree may be entered in favor of the libelant. An assessor may be appointed to assess damages in accordance with this opinion. The libelant may recover its costs.