## THE STIRLING TOMKINS.

### SHAMROCK TOWING CO. v. CORNELL STEAMBOAT CO.
### JAMES A. MEENAN, Inc., v. SAME.
#### Nos. 232, 233.

Circuit Court of Appeals, Second Circuit.
March 7, 1932.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for appellant Cornell Steamboat Co.

Alexander, Ash & Jones, of New York City (Edward Ash and Lawson R. Jones, both of New York City, of counsel), for appellee Shamrock Towing Co.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt, of New York City, of counsel), for James A. Meenan, Inc.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The above two causes were tried together. In the first a libel was filed by Shamrock Towing Company as owner of the barge Curry to recover damages arising from the grounding of the barge when being towed by the tug Stirling Tomkins, of the Cornell Steamboat Company. In the second, a libel was filed by the owner of the cargo on the Curry to recover damages likewise due to the grounding.

The tow consisted of about twenty barges in eight tiers, with a hawser running to the first tier of about 450 feet in length. The tow altogether was in the neighborhood of 1,600 feet long. The Curry was a loaded barge on the port side of the third tier, having two other barges to her starboard. The towage operation was in charge of the tug Stirling Tomkins, belonging to the Cornell Steamboat Company. She was assisted by the tugs Bavier and Terry. The three tugs had proceeded with their tow down the Hudson river to a point slightly below Highland Falls, and were about to pass through the Narrows when a dense fog set in. Mc-Donald, the master of the Tomkins, who was then proceeding on a course south by west, slowed down to a speed of about one mile an hour, and sent the helper tugs Bavier and Terry to the tow. He did not give these tugs any instructions as to what to do for the tow, because, as he stated, their pilots were experienced men who "know what they have to do when they go back there." The Bavier took a position on the starboard side of the tow aft, and the Terry on the port side at the second tier from the stern.

The fog was so dense that the tugs could see no lights on the shore—neither the navigation lights on the west side of the river at Con Hook nor the flashlight on the buoy, marking a reef about 1,500 feet south of Con Hook. When McDonald believed he was opposite Con Hook, he changed his course from south by west to southwest. Such a change was necessary in order to take the tow around the bend in the river, which, below Con Hook, curved rather sharply to the southwest. If McDonald had estimated his position correctly, this change in course would have been exactly right as he made it. But he underestimated the distance he had run on his first course and changed to the southwest too late. As a result, the tow was forced to pass around a sharp bend in the river instead of taking a more gradual swing, and the Curry grounded in shallow water and sustained injuries.

The ebb tide running at about three knots an hour was bound to strike the starboard side of the long line of barges and to set the tow toward the easterly shore. So, unless the Tomkins kept far out in the stream, as it rounded the bend, and the helper tugs held up the rear, the tow would necessarily sag

toward the east and be likely to sustain the very injuries which it suffered.

As the Tomkins took her tow down through the fog, she sought to determine her position with reference to the two sides of the river by blowing whistles. This is a method commonly employed by Hudson river boatmen to locate the position of a vessel in the narrows when a fog sets in. The nearer the vessel is to the shore the louder will be the echoes coming from the circumjacent cliffs when she blows her whistles. Accordingly the Tomkins kept blowing her whistle, and by this, and her compass and speed, attempted to reckon her location. In the same way the Bavier and the Terry kept blowing whistles and attempting from the echoes to estimate the position of their tow. By this expedient they suddenly discovered that the tow was unduly close to the easterly side of the river. The Bavier thereupon put a stern line on the tail of the tow and maneuvered to hold it further out in the stream, while the Terry proceeded forward and warned the Tomkins that the tow was too far to the east. The master of the Tomkins, on receiving the warning, ported his helm and continued on his way. After going forward to the Tomkins and giving this notification, the Terry discovered that the Curry and certain other of the port barges had swung away from the tow and that the Curry was leaking badly, plainly because of her previous grounding on the easterly shore. The Terry at once shoved her and the other barges that had come loose back into the tow and put a siphon in her to pump her out. But she leaked so badly that the Terry finally took her from the tow and towed her on two short hawsers to Verplanck Point and beached her there. This was necessary to keep her from foundering and to save her and her cargo. While she was being beached, some of her cargo which was stowed high on her deck went overboard and was lost in the river.

The District Judge found the Tomkins negligent (a) because her navigator failed to arrange any code of signals by which the helper tugs at the stern of the tow could have signaled for a starboard or port passage; and (b) because the Tomkins proceeded in the fog without ascertaining her position by using one of the helper tugs to locate Con Hook Light or by sounding.

Because of the foregoing acts of negligence, the libelant in the first cause was granted an interlocutory decree with the usu-

al reference to determine the damage to the barge Curry, and the libelant in the second cause was granted a similar interlocutory decree with a reference to ascertain the loss to its cargo. In our opinion, there was sufficient proof of some damage to cargo to justify the second interlocutory decree, provided that the Tomkins was properly held liable for the grounding of the Curry.

The Cornell Steamboat Company, respondent and claimant of the Tomkins, appeals on the ground that her master, McDonald, was a competent and experienced navigator, that when the damage occurred, the tug and tow were lost in a dense fog, and that the libelants offered no proof that McDonald failed to act with ordinary care and skill.

It is true that a tug and her owner, while required to exercise good seamanship, are not liable for mere errors of judgment in difficult situations and are not required to "do precisely what, after the event, others may think would have been best." The Hercules (C. C. A.) 73 F. 255, 258; The Victoria (C. C. A.) 95 F. 184; The W. H. Baldwin (C. C. A.) 271 F. 411. But there have been numerous cases where courts have decided what was and what was not prudent navigation without the aid of expert nautical testimony. Indeed occasions where courts determine just that sort of thing are frequent. They are ordinarily where the problem seems too simple to require experts to aid in its solution.

In the present case it would occur to almost any one that the helper tugs should have been notified of the change of course of the Tomkins from south by west to southwest so that they could hold up the tail of the tow and prevent it from swinging to the east. Both the change in course and the effect of the ebb tide on the long tow were inevitable and foreseeable events, and the Tomkins could readily have arranged signals with the Bavier and the Terry to notify them of her change of course and could have instructed them before she sent them back to the tow to hold it up when they received the signals. This simple expedient would have enabled the Tomkins to keep her tow in line as she was bound so far as practicable to do, and would have avoided the accident. As it was, she proceeded right on in the dense fog without any warning to her tow when she changed her course. In consequence her long tow got across the tide and swung into the easterly shore. The Supreme Court has held

it negligent for a tug not to signal her tow when she changes her course. British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U. S. 1, 42 S. Ct. 430, 66 L. Ed. 807.

█ It may be that signals of the helper tugs to the Tomkins that the latter go to port or starboard would have so divided the management of the flotilla as to have been undesirable. Likewise it may have been impracticable for the Tomkins to send one of her helper tugs to locate lights on the shore, and perhaps soundings which have been suggested as a means of ascertaining position would have been valueless, when the water was almost uniformly deep. But we cannot see why notification by the Tomkins to the helper tugs of her change of course would not have been entirely practicable and was not a prudent and necessary step when she was preparing to round a bend in the river with her tow. Even if a better plan than a signal by the tug to her tow when she changed her course could be suggested by a nautical expert, the burden of showing that good navigation did not require a step so apparently obvious was upon the tug. The grounding of the tow called for an explanation. The attempted explanation was the presence of a dense fog, but the tug had to meet the prima facie proof of fault occasioned by grounding her tow by showing not only that she was in a troublesome fog, but that her master did everything a skillful navigator should have done while in a fog to keep the tow in line and to keep it from sagging into the shore as it rounded the bend in the river and was subjected to the impact of an ebb tide. In our opinion, no explanation sufficient to justify the grounding has been given.

The interlocutory decrees are accordingly affirmed.