## THE ALGIC.

## THE CAPILLO.

## THE VOLUNTEER.

## THE THREE FRIENDS.

## THE ELEANOR.

### Nos. 276, 277.

District Court, S. D. Florida, Jacksonville Division.

Feb. 27, 1936.

John W. Holland, U. S. Dist. Atty., of Jacksonville, Fla., and J. Frank Staley and M. H. Avery, Sp. U. S. Attys., both of Washington, D. C., for libelant.

Bedell & Bedell, of Jacksonville, Fla., for claimants.

STRUM, District Judge.

By libels in admiralty the United States, in its own behalf as owner of the steamships Algic and Capillo, and on behalf of C. H. Sprague & Son, Inc., as operator of said vessels, claims damages in rem against the tugs Three Friends, Volunteer, and Eleanor, and in personam against their owner, Jacksonville Forwarding Company, for damages alleged to have been suffered by the Algic and Capillo when grounded in the port of Jacksonville, Fla., while being shifted by said tugs. Charging negligence of the tugs and those in charge of them, recovery is sought by the United States for the cost of repairs, and on behalf of Sprague & Son, Inc., for loss of use of said vessels during repairs. Separate libels were filed, one relating to the Algic, involving the tugs Volunteer and Eleanor; one relating to the Capillo, involving the tugs Volunteer and Three Friends; in personam liability of the own-

er being charged in both. Because of the similarity of the questions involved, both libels will be considered together.

Jacksonville Forwarding Company contracted with the United States Shipping Board to dock, undock, and shift Shipping Board vessels in the port of Jacksonville for stated charges. Jacksonville is the home port of all the tugs here involved. The contract, evidenced by a letter of proposal from the Shipping Board to the Jacksonville Forwarding Company, dated December 16, 1927, and accepted in writing by the Forwarding Company, provided that: "Your (claimant's) tugs will be responsible for any damages incurred by ship or tug, provided, however, that such damage is attributable to the fault of the tug or tug master."

On April 14, 1934, the Forwarding Company was directed to shift the Algic from quarantine anchorage near the Municipal Docks, to the docks of Gulf Refining Company, a short distance down stream (north), which service was undertaken pursuant to the existing contract. The tugs Volunteer and Eleanor were assigned to handle the movement, which commenced about 7:58 p. m. The Algic is a vessel of 5,496 gross tons, 400 feet in length, 54 foot beam, and was drawing 20 feet 8 inches forward and 24 feet aft.

In the vicinity of Six Mile creek, the main ship channel of the St. Johns river runs approximately north and south, is well marked, and has a depth of approximately 31 feet for a width of about 450 feet. At the mouth of Six Mile creek, approximately three-fourths of a mile north of quarantine anchorage and one and one-half miles north of the Municipal Docks, a channel has been dredged from the west side of the main ship channel to the Gulf Refining Company docks on the west bank of the river, at the mouth of Six Mile creek, a distance of about 1,100 feet. The Gulf channel runs approximately east and west at right angles with the main ship channel, the Gulf Refining Company docks being at the west end of the Gulf channel. The entrance or easterly end of the Gulf channel is marked by two dolphins, 335.22 feet apart, standing on opposite sides (north and south) of the Gulf channel about 380 feet west of the west side of the main ship channel. Between the two dolphins at the easterly end of the Gulf channel there is a 24-foot depth of water for a width of about 222 feet, in the center 100 feet of which there is a 30-foot depth. From these dolphins the Gulf channel opens out broadly to the main ship channel, 380 feet to the east, at a depth of about 30 feet. The easterly or entrance dolphins stand in 18 feet of water; the distance from the south dolphin to the southerly 24 foot contour in the Gulf channel being about 118 feet.

When the Algic was shifted, the master of the tug Volunteer was in command of the movement, directing the operation from the bridge of the Algic. She was brought to a point in the main ship channel approximately opposite the entrance to the Gulf channel where she was turned to port about 90 degrees and headed west into the latter channel. When she had the south entrance dolphin about abeam on the port side, the flood tide, then running from north to south across the mouth of the Gulf channel, caused her stern to sag upstream toward the south dolphin, where she grounded at or about 8:30 p. m., with the south dolphin alongside her midship section on the port side. Throughout the shift, the Algic had full steam up and her main engines were available for use at all times, and were actually used as directed by the tug master in charge. As she entered the Gulf channel, the strongest tug, the Volunteer, was under her starboard bow, while the smaller tug, the Eleanor, was under her starboard quarter. The tug master had the tugs thus arranged expecting an ebb tide from south to north. When it was seen that the tide was flood (flowing south) and that the Algic's stern was sagging towards the south dolphin, the tug master ordered the Eleanor to the Algic's port quarter, so as to hold her up against the flood tide, but before the tug could assume this position, the Algic had grounded.

On August 6, 1934, the Forwarding Company undertook to shift the steamship Capillo from the Municipal Docks to the same Gulf Refining Company docks, at the west end of the Gulf channel above referred to. The Capillo is a vessel of 5,135 gross tons, 390 feet in length, 54 foot beam, and was drawing 14 feet 9 inches forward, 23 feet 3 inches aft. The tugs Three Friends and Volunteer handled this movement, which was in command of the master of the Three Friends, who directed the operation from the bridge of the Capillo. This movement commenced about 8:14 p. m. When the Capillo was

837

backed out of her slip at the Municipal Docks, she was grounded by the stern in shoal water off the head of the docks. She came clear in a few minutes, however, and proceeded north to the Gulf channel into the mouth of which she was maneuvered in like manner as the Algic, having the tug Three Friends under her starboard bow and the Volunteer on or near her port quarter; the Volunteer having been placed there as the vessel was turned to head west into the Gulf channel. The Volunteer, however, was not squared off at right angles with the Capillo, but was alongside parallel with the ship. When about half a ship's length in the Gulf channel headed west, the Capillo's stern was set to port (south) by the flood tide, and at 9:15 to 9:30 p. m. she was grounded by the stern against the same entrance dolphin, and substantially in like manner as the Algic; the dolphin being about the middle of the Capillo's after well deck, port side, which would be about 300 feet aft from her bow.

On April 14, 1934, when the Algic was grounded, the Coast & Geodetic Survey Tide Tables predicted that flood current would commence at that point at 7:15 p. m. and would reach its maximum at 9:27 p. m., with a velocity of .9 knots. By actual observation the flood current actually commenced at that point at 8:10 p. m. The Algic's movement began at 7:58 p. m., and she was grounded at or about 8:30 p. m.

On August 6, 1934, when the Capillo was grounded, flood tide was predicted for that vicinity at 5:57 p. m., and actually occurred at 8 p. m.; ebb current actually occurring at 10:40 p. m. At 9:15 to 9:30 p. m., the time of the stranding, the current was flood, with a velocity of about 1 knot.

■ The service undertaken by the Forwarding Company and its tugs was not one of pilotage, in which the pilot was the servant of the ship; it was a towing and docking undertaking. The tugs were assisting in moving the vessels from one berth to another, as well as in docking them. The tug masters who commanded the operations were agents of the Forwarding Company in the performance of the latter's contract, with full authority to act on its behalf. Upon principles of agency, applicable in admiralty as elsewhere, the Forwarding Company is liable in personam for the negligence of its

agents in the performance of their duties. The Edward G. Murray (C.C.A.) 278 F. 895.

■ A contract of the character here involved imposes neither an insurer's obligation, nor the liability of a common carrier. Such a contract requires in its performance only that degree of caution and skill which prudent navigators and seamen usually employ in similar services in like circumstances. The Webb, 81 U.S.(14 Wall.) 406, 20 L.Ed. 774. No liability attaches to tug or owner for a mere error of judgment. To exculpate, however, the error must be excusable; one that is consistent with reasonably skillful seamanship and navigation in the circumstances. If the error amounts to negligence, liability follows. The W. H. Baldwin (C.C.A.) 271 F. 411; Gilchrist Transp. Co. v. Great Lakes Towing Co. (D.C.) 237 F. 432, affirmed (C.C.A.) 248 F. 1019; 63 C.J. 25(60).

■ A vessel undertaking to render services of this character, and her operators, are bound to use reasonable care and skill in the management of the ship being aided, both as to navigation and seamanship, and must exercise such care in everything relating to the work until it is accomplished. One who directs operations such as these, must know the depth of water in the channel, the ordinary obstructions which exist, the width and course of the channel, the state and effect of ordinary currents and tides, the proper time of entering upon the maneuver, and generally all conditions essential to the safe accomplishment of the undertaking. He is also required to know whether, under the conditions then prevailing or reasonably to be expected, it is safe to make the proposed maneuver. If the maneuver to be performed is a difficult one, care commensurate with the difficulty must be used. Failure in these requirements is lack of due skill and care, for which the offender is liable to the extent of the damage thereby occasioned. The Margaret, 94 U.S. 494, 24 L.Ed. 146; The T. J. Schuyler (C.C.) 41 F. 477; Gilchrist Transp. Co. v. Great Lakes Towing Co., supra; The Allegheny (C.C.A.) 252 F. 6; The Harry M. Wall (D.C.) 187 F. 278; The W. G. Mason (C.C.A.) 142 F. 913; Coastwise Transp. Corp. v. United States (D.C.) 43 F.(2d) 401; The W. H. Baldwin (C. C.A.) 271 F. 411; The Inca (C.C.A.5) 148 F. 363; Baltimore & Boston Barge

Co. v. Knickerbocker Steam Towage Co. (D.C.) 159 F. 755; The Marie Palmer (D.C.) 191 F. 79; Note, 54 A.L.R. 104; 63 C.J. 26(62), 42(96), 45(102).

There is evidence that inshore along the face of the docks in the vicinity in question, and sometimes in the Gulf channel, there is an eddy or counter current, but there is no claim that the action of such a current was responsible for these groundings, even if such would constitute an exculpatory circumstance. There were no extraordinary conditions of wind, weather, or tides, and there is no claim of contributory negligence on the part of the towed vessels or their personnel. Nor is there any claim that the vessels took a sudden sheer while entering the channel. Cf. Baltimore & Boston Barge Co. v. Knickerbocker Steam Towage Co. (C. C.A.) 170 F. 442. The undisputed testimony is that both sagged by the stern slowly to port under the effect of flood current then running across the mouth of the Gulf channel, when in both instances the tug masters in command expected an ebb current. The tide tables predicted flood tide at the point and times in question, and flood tide existed by actual observation, though it set in later than predicted.

■ The manner in which both vessels grounded convincingly demonstrates that the tug masters misjudged the direction and force of the current at the mouth of the Gulf channel, and failed to take the vessels a sufficient distance down stream, or north of the entrance of the Gulf channel, before turning them to the west, having in mind the existence of a flood tide at the time. The currents may have been variable, but their direction and force were known, or in the exercise of reasonable diligence could have been known, to the tug masters. All that was needed was to give them careful attention, and to make allowances for their effect. So much, prudent navigation requires. There is no evidence that there was anything uncommon in the direction and force of the tides, or of the weather, at the times in question. In each instance, the tug master had ample warning, if not knowledge, to expect a flood tide setting south across the mouth of the Gulf channel which would drift the stern of the vessels to port, particularly after the bow entered the still water of the Gulf channel. In these circumstances, due care and skill required that they either maneuver the vessel well toward the north side of the channel on entering, where there was ample water, or that they have a tug on the port quarter of the towed vessel capable of holding her stern up against the flood current, and so rigged as to do so. In these duties the tug masters failed in each instance. Such failure, though an error in judgment, is one which, being inconsistent with due care in the circumstances, is negligence for which their principal, the Forwarding Company, is liable in personam. It is clear that both the Algic and Capillo when they grounded were well to the southward of the southerly 24-foot countour of the Gulf channel, and that had they been held in the channel they would not have grounded. The shoal on which they were grounded was well known and marked by a dolphin.

■ While it is competent to alter both in rem and in personam liability by contract in these cases (Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311), the contract between these parties does not relieve the Forwarding Company of its liability in personam for the negligence of its agents, the tug masters.

■ Notwithstanding the terms of this contract, the tugs themselves would be liable in rem only for their own independent negligence. The Edward G. Murray (C. C.A.) 278 F. 895; The Sarnia (C.C.A.) 261 F. 900; The W. G. Mason (C.C.A.) 142 F. 913. The contract provided that "your tugs" will be responsible for damages attributable to the fault of "tug or tug master." This contract, however, does not purport to give a maritime lien upon all tugs participating in the movement regardless of their own negligence, nor to fix liability in rem upon a tug which is itself free of independent fault, merely because her master, in general control of the movement, was negligent in directing the operation from the bridge of the towed steamer. To alter the settled law in this respect would require more apt and explicit language than appears in this contract.

■ In the Algic Case, however, the tug Eleanor was guilty of independent negligence in that she did not shift to the Algic's port quarter until about the time, or after, the Algic grounded, although it must have been clearly apparent to the Eleanor's master, and due care re-

quired him to know, that a flood current was running which would set the Algic's stern to port, and that his tug, which was assigned to the Algic's quarter, would be needed on the port quarter to hold the Algic up against the flood current, and that the tug would be useless on the starboard quarter. That he was following the general directions of the tug master in charge of the operation will not expulpate him in the face of so plain a duty. The Edward G. Murray (C.C.A.) 278 F. 895. The Volunteer, on the Algic's starboard bow, was guilty of no independent negligence in turning or maneuvering the Algic. It was not a lack of due care to have a tug on the Algic's starboard bow, and the Eleanor had been assigned to the quarter. That the Algic was not taken far enough to the north side of the channel before being turned involved no independent negligence on the part of the tug Volunteer, though her master, directing the movement generally from the bridge of the Algic, be guilty of negligence which would fix liability in personam upon the principal, the Forwarding Company.

In the Capillo Case, the Three Friends, which was under the Capillo's starboard bow, was guilty of no independent negligence for the same reasons just stated as to the Volunteer in the Algic Case. Here, however, the Volunteer had been assigned to the port quarter, in or near which position she was when the Capillo grounded. But instead of being squared off at right angles with the Capillo so that she could hold the Capillo's stern up against the flood current, which obviously was running, she was secured alongside and parallel to the Capillo with one bow line, in which position she was useless, as was the condemned tug, the Edward G. Murray (C.C.A.) 278 F. 895. It is common practice to dock and undock vessels of the size of the Capillo with a tug squared off on the quarter, but the tug must be held in place by two bow lines, one tending forward and one aft on the steamer being aided. Due care required the Volunteer to be in this position in the Capillo case, as it was clearly apparent that without effective help on the port quarter the Capillo's stern would sag to port, as it did.

It follows that for such damage as was caused by these groundings, the Forwarding Company is liable in personam in both cases; the tug Eleanor is liable in rem in the Algic Case; while the tug Volunteer is exonerated in that case, but is liable in rem in the Capillo Case. The tug Three Friends is exonerated.

Claimant excepts to so much of the libel as purports to be by the United States, on behalf of Sprague & Son, for loss of use of the vessels during the period of repairs, upon the ground that admiralty recognizes only the real party in interest.

In admiralty, all persons entitled on the same state of facts to participate in the same relief, may join as libelants whether the action be in personam or in rem. While there are well-established exceptions in certain cases, the general rule is that the libel should be in the name of the real party in interest. Here, Sprague's claim is not by virtue of subrogation to any right of the United States, nor does that claim fall within any of the recognized exceptions to the general rule. Sprague's claim is an independent one, though depending for recovery upon the same facts which would afford relief to the United States, so far as liability is concerned. In these circumstances, Sprague & Son should join as libelants. Claimant's exception is therefore sustained as to the claim on behalf of Sprague & Son. Fretz v. Bull, 12 How. 466, 13 L. Ed. 1068; Eastfield S. S. Co. v. McKeon (D.C.) 186 F. 357, reversed on other grounds (C.C.A.) 201 F. 465; 1 C.J. 1297(148).

Decree accordingly, which may be settled on notice.