**SHASTA S. S. CO., Inc., v. GREAT LAKES TOWING CO.**

No. 2117.

District Court, W. D. New York.

April 15, 1942.

Sanders, Hamilton, Dobmeier, Connelly & McMahon, of Buffalo, N. Y. (George Clinton, Jr., of Buffalo, N. Y., of counsel), for libellant.

McKeehan, Merrick, Arter & Stewart and George William Cottrell, all of Cleveland, Ohio (C. A. Schipfer, of Cleveland, Ohio, of counsel), for respondent.

KNIGHT, District Judge.

This is an action in admiralty arising out of a collision between the steamer Shasta and the easterly span of the Jefferson Avenue Bridge across the Cuyahoga River at Cleveland, Ohio, causing damage to the steamer Shasta.

On August 29, 1940, the steamer Shasta, a bulk freighter 383 feet long by 50 feet beam and 28 feet molded depth, was lying at anchor under the breakwater at Cleveland, Ohio. She was laden with iron ore and was drawing 20 feet 6 inches of water both forward and aft. The Shasta was awaiting her turn to go up the Cuyahoga River to the Corrigan-McKinney Steel Plant, which plant is above the Jefferson Avenue Bridge over the Cuyahoga River. This bridge had broken down about two weeks previous to August 29, 1940, so that while the west leaf of this double lift bridge could be lifted to a perpendicular position, the east leaf could not be lifted and was stuck in a position which was about 25° above the horizontal. The effect of this was to narrow the space through which vessels could pass when proceeding up or down the river by about one-half. The distance across the river from each abutment of the bridge to the other was about 130 feet, so that the available space for the passage of vessels on August 29, 1940, was about 65 to 70 feet.

The Shasta had arrived at the Cleveland breakwater about 3:20 P. M., and after obtaining the services of the tug Indiana belonging to the respondent proceeded slowly up the Cuyahoga River in a southerly direction bound for the dock at which she was to discharge her cargo. The Shasta assisted the tug Indiana during the trip up by using her engines, and they arrived in the vicinity of the Jefferson Avenue Bridge about 10 P. M. on August 29, 1940. About 800 feet below the Jefferson Avenue Bridge, the tug Nebraska, also belonging to the respondent, by prearrangement, took a line from the stern of the Shasta. From the time the Nebraska took her stern line, the Shasta's engines were stopped until shortly before the collision with the easterly leaf of the Jefferson

Avenue Bridge. The Shasta had proceeded about one-half way through the draw safely when a situation arose which is the subject of some dispute in the evidence.

The libellant contends that the tugs of the respondent placed the Shasta in a hazardous position. Further, the libellant contends that, when the Shasta was about three-fourths of the way through the draw, the bow tug Indiana started to pull the bow of the Shasta to the starboard swinging the stern to port toward the broken leaf of the bridge; that the master and mate of the Shasta shouted a warning to the Indiana to stop pulling but received no response from the bow tug Indiana either by word or act. The master of the Shasta then blew a five whistle danger blast which was disregarded by the tugs until it was too late to avoid a collision with the broken leaf of the bridge. The captain of the Shasta then reversed his engines in an attempt to minimize the force of the impending collision with the east leaf of the bridge. It is the libellant's contention that if the action of the captain was not proper it was due to the circumstances in which he found himself as a result of the actions of the servants of the respondent and that any error in judgment was due to the extremely dangerous position in which the servants of the respondent had placed him.

The respondent, on the other hand, contends that its servants were competent and that they were performing their duties in a competent manner and that there was no danger; that the captain of the Shasta gave the tugs a strong ahead signal followed by a stop signal; that the captain of the Shasta attempted to divest the control from the tugs by reversing his engines and such action did wrest control from the tugs and thus caused the collision which damaged the Shasta; that all the actions of the captain of the Shasta were wrongful and endangered the entire operation and did result in a collision which the tugs of the respondent attempted to avert, but because of the action of the captain of the Shasta they were frustrated and the collision resulted and the damage sustained.

The respondent further contends that the stern tug, Nebraska, had her tow line taut at all times and was shoving hard to shove the stern of the Shasta over to the west abutment as the Shasta was going through the draw, except during the interval of time during which the steamer

Shasta backed her engine, which backing of the engine caused the tug to be thrown out of position by the suction of the Shasta's propeller. The bow tug Indiana was pulling slightly to the starboard when the Shasta blew four short blasts of the whistle and in response thereto the tug Indiana pulled strong ahead for about 10 seconds when she stopped because of a one blast whistle from the Shasta. The respondent claims that this pulling had no effect as the time was too short. The respondent also claims that the Shasta backed her engine before she blew any signals whatsoever and that such backing threw the stern tug out of position and made her ineffective; that the entire fault for the collision is on the captain of the Shasta because he gave improper signals and reversed his engines which caused the collision which damaged the Shasta.

The libellant asks damages and the respondent for a dismissal of the libellant's action.

### Findings of Fact.

I. The bow of the Shasta was drifting to port when she was one-half to three-fourths through the draw and the bow tug Indiana was pulling to the starboard. The physical effect of exertion of power on the starboard of the bow is to swing the stern to port which, in this case, would swing the stern of the Shasta towards the disabled easterly leaf of the bridge. What the stern tug Nebraska was doing during this portion of the operation is much in dispute. The witnesses of the libellant testify that she was doing very little to keep the stern of the Shasta against the westerly bank of the river, and the witnesses of the respondent testifying that the Nebraska was working strenuously to keep the Shasta against the westerly bank. Both parties have introduced disinterested witnesses to testify as to the actions of the Nebraska. The libellant's witness, the bridge captain, testifies that the Nebraska was not in proper position and that he shouted a warning to the Nebraska. Although his testimony is inconsistent in some parts, his testimony is more specific as to essential actions of the steamer than the testimony of the witness of the respondent. The respondent's witness was a spectator standing near the bridge abutment who apparently became a bit confused by the close proximity of the boats and his nearness to the whistle blasts.

While his testimony is not doubted, it is more likely that he might not have all the events as he saw them in their chronological order, because of the events preceding and surrounding the accident. On the other hand, this witness for the libellant was accustomed to seeing boats coming through the draw and knew the manner in which most were taken through. His could be said to be the observations of a skilled observer, because of his many experiences. I feel that the libellant's witness should have more weight than those of the respondent and find that the stern tug Nebraska was not in the position normally taken in assisting boats through the draw and that she was not working her engines as hard as she might and should have done to keep the stern of the Shasta against the westerly bank of the river and away from the disabled easterly leaf of the bridge.

II. There is agreement as to the total number of whistle blasts blown by the Shasta but violent disagreement as to the time spacing of these blasts; the respondent claiming four and one and the libellant claiming five. Here again I am inclined to give more weight to the testimony of the libellant's witnesses as the captain had control of the giving of the signals and his crew would have had to have reacted differently under signals given according to respondent's witnesses. I further find that the respondent's contention that the Shasta was in the control of the tugs is correct. Therefore any signals given by the steamer need not have been obeyed by the tugs as they were in charge of the entire operation and had control of the steamer. It was within power of the tugs to disregard any signals of the steamer if they wished, and they should have carried on the operation as they thought it should be carried out and not in accordance with the wishes of one under their control. Further, I find that the respondent does not attempt to explain its contention in regard to the four whistle blast by the steamer relative to such signal being meant for the stern tug. It is apparent under the contention of the respondent that the four whistle blast by the steamer could have been meant for the stern tug to use full speed ahead. The respondent assumes that this signal was meant only for the bow tug and such tug took no action to ascertain what such signal was for.

■ III. The tug Indiana was employed to assist the steamer up the river. The danger in passing through the disabled bridge was known. The additional tug was engaged on account of this danger. It was the duty of the tugs to exercise special care by reason of the existing condition. I am satisfied that the tugs did not hold the steamer close enough to the westerly bank of the river. There was nothing to prevent this. I am satisfied that the captain of the steamer gave the danger signal. It is possible that the collision then could have been prevented by the right manipulation of the tugs. This was not done. While the evidence supports the opinion that the normal action of the reversal of the steamer's engines would result in shifting somewhat the stern toward port, I am of the opinion that such reversal in no way contributed to the collision. My reasons for this opinion are that the stack and the spar were then too close to the end of the bridge upright. There was too little time intervening the reversing of the engines and the collision for any appreciable effect upon the movement of the stern. Further, if respondent's contention is true that the stern tug was headed diagonally across the channel and pulling with its full power, there could have been no appreciable movement of the stern to port by reason of the reversal of the engines.

■ IV. In the matter of reversing the wheel of the Shasta by the master, it is apparent that such action was the action of a reasonable man under the circumstances as the master was some 300 feet from the scene of the accident and when he saw that his boat was going forward into a fixed object the natural reaction was to stop the forward progress of the boat, and the only means of doing so was by reversing the wheel. The contention of the respondent that the proper thing to do under the circumstances was to proceed forward and use the rudder is tenable, but, when a master is 300 feet from the immediate scene and action is imperative, the question of sufficient space to perform such maneuver is difficult to judge and such maneuver might cause further damage if unsuccessful. If the reversal did effect the movement of the stern, the action of the captain was made in extremes for which libellant is not responsible. "Negligence in fact does not lie in such conduct, nor is it to be pre-

sumed as a matter of law. Even if the pilot had not acted thus competently, the question of negligence would still be resolved in the light of the circumstances. * * * And, when faced with an emergency, negligence does not flow from mere errors in judgment. The apprehension of possible collision is not likely to foster the clearest foresight." The Bellatrix, 3 Cir., 114 F.2d 1004, 1007. Vide, also, The Arkansan, 9 Cir., 112 F.2d 230.

V. The first and third mates of the Shasta were not called as witnesses, and the respondent invokes the rule that the failure to call by libellant warrants the presumption that, if produced, their testimony would have been unfavorable to the libellant. As to the rule there can be no doubt. Clifton v. United States, 4 How. 242, 45 U.S. 242, 11 L.Ed. 957; The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; The Eastchester, 2 Cir., 20 F.2d 357; The Condor, D.C., 8 F.Supp. 929; Wigmore on Evidence, 3d Ed., Vol. II, p. 162; sec. 285. But respondent is hardly in a position to invoke this rule here. On the trial libellant's counsel stated libellant's inability to locate these men and the efforts made to locate them. Counsel for libellant offered in evidence testimony given by the first mate before the steamboat inspectors. This was excluded on respondent's objection. But the respondent's counsel then stated that he "had no objection to make to that", referring to the reasons given by the counsel for the respondent for the non-production of these men. It seems to me that upon the record their absence has been sufficiently accounted for, and upon the foregoing admission the situation is the same as though the libellant had produced witnesses to testify as to the efforts made to locate them. Under these circumstances, the rule stated does not apply.

VI. That the tugs Indiana and Nebraska failed to so divert the course of the Steamship Shasta as to avoid collision with the Jefferson Avenue bridge aforesaid.

### Conclusions of Law.

1. I find that the libellant, its servants and agents were free from negligence.

2. I find that respondent, its servants and agents were negligent; that the negligence of the respondent, its servants and agents caused certain damages to the libellant; and that reference be made to Arthur E. Otten as Commissioner to assess such damages.

3. I find that the libellant recover costs from the respondents.