235 F.2d 741
 William A. BISSO, Jr., Receiver of New Orleans Coal and
Bisso Towboat Company, and Moran Towing &
Transportation Company, Inc., and THE
MARION MORAN, Inc., Claimant
of THE KEVIN MORAN, Appellants,
v.
WATERWAYS TRANSPORTATION COMPANY, Inc., Claimant of THE
JAMES L. RICHARDS, Appellee.
 No. 15464.
 United States Court of Appeals Fifth Circuit.
 June 30, 1956.
Rehearing Denied Sept. 20, 1956.
 
 Norman Stallings, Hervey Yancey, Tampa, Fla., John W. Sims, New Orleans, La., Adrian J. O'Kane, New York City, Shackleford, Farrior, Shannon & Stallings, Tampa, Fla., and Burlingham, Hupper & Kennedy, New York City, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Fowler, White, Gillen, Yancey & Humkey, Tampa, Fla., of counsel, for appellants Moran Towing & Transp. Co., Inc., and Tug Kevin Moran.
 Alfred M. Farrell, Jr., New Orleans, La., Christopher E. Heckman, New York City, Chester H. Ferguson, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., and Foley & Martin, New York City, for appellee.
 Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 In a pleader's paradise of two hundred fourteen printed record pages of libels, cross-libels, impleading, petitions, answers, reconventions, and claims for contract and maritime salvage, towage, for damage and general average expense, the District Judge declared that The Kevin Moran, the command tug on a hawser ahead, and The Mary B., assisting on the starboard quarter, were liable for the stranding, in the entrance of Southwest Pass, Mississippi River, of The James L. Richards, a former vessel 359 feet long, 49-foot beam, operated as a seagoing barge without motive power but equipped with a steam steering engine actuated by a hydraulic telemotor system from the bridge. The case comes to us on a record of an additional twelve hundred one printed pages of testimony from some twenty-five witnesses, a good portion of whom gave evidence by deposition. The scope of this record, the somewhat complex technical problems involved, and the inevitable running advocacy to which a Judge is properly exposed as a case is being presented, whether with live or printed swearers, illustrates the inherent soundness in a rule which commits to Trial Judges the trying and finding of facts and those significant inferences which come from them. Whatever vestigial power remains to invoke trial de nove, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 A.M.C. 1999; Taylor v. Crain, 3 Cir., 224 F.2d 237, 238, 1955 A.M.C. 1499; cf. Coyle Lines v. United States, 5 Cir., 195 F.2d 737, 1952 A.M.C. 715; Coryell v. Phipps, 5 Cir., 128 F.2d 702, 1942 A.M.C. 906, affirmed 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, 1943 A.M.C. 18, this is certainly not a case in which to seek out or apply its limits. We start, therefore, with willing acceptance of the Trial Court's findings unless clearly erroneous. C. J. Dick Towing Co. v. Leo, 5 Cir., 202 F.2d 850, 1953 A.M.C. 498; Mississippi Valley Barge Line Co. v. Indian Towing Co., 5 Cir., 232 F.2d 750, 1956 A.M.C. 757; Societa Anonima Navigazione Alta Italia v. Oil Transport Co. (The Mongioia), 5 Cir., 232 F.2d 422; see, Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.
 
 
 2
 The channel in Southwest Pass runs southwest-northeast between two long fingers. The East jetty ends at a point somewhat sough of the end of the West jetty. Through this mouth the river floods out on the general course of the Pass. The entrance, however, from the Sea Buoy is on a course (Outer Range) of 0 degree (North). When just slightly above the end of the East jetty, the course (Inner Range) changes to 25 degrees. At that point of course, the stream catches an ascending vessel's starboard bow and tends to set it to the west (port hand). Here, The Kevin Moran, running under full ahead with a hawser of 300 to 400 feet, had The James L. Richards dead on the Outer Range at the time the tug, arriving at the intersection of Outer and Inner Ranges, hauled well to the right (approximate heading 38 degrees) to swing the tow into the turn. The James L. Richards, however, did not swing. Instead, she kept coming straight on (heading substantially 0 degree). This and the resulting action was described as a 'sheer'-- a subsidiary, semantic controversy of no substantial significance, since responsibility is fixed by the cause, not the label, cf. Baltimore & Boston Barge Co. v. Knickerbocker Steam Towage Co., D.C.Me., 159 F. 755, 766, 767, affirmed 1 Cir., 170 F. 442, 443; The Algic, D.C.S.D.Fla., 13 F.Supp. 834, 838; The Bulkcrude, D.C. Tex., 107 F.Supp. 771, 774, 1952 A.M.C. 1400; The Oscar B., 9 Cir., 121 F. 978; The Stranger, 23 Fed.Cas. page 220, No. 13,525. For however described, what happened was that the vessel merely forged ahead and, not turning as intended, she was almost immediately caught by the full flood of the river and, with considerable force, set over to the west, dragging The Kevin Moran astern with her, until she stranded on a mud lump where she remained for some thirteen days. When it was noticed that The James L. Richards was not following the turn, the tug Mary B., on the starboard quarter, was ordered to go full ahead with a hard right rudder, and simultaneously the pilot on The James L. Richards ordered the starboard anchor dropped, but the Barge's Captain (an unlicensed seaman) dropped the port anchor instead. The anchor was soon under foot causing substantial damage to the bottom plates.
 
 
 3
 One gets from an objective reading of this whole record the definite conviction that the stranding clearly ought not to have taken place. To be sure, there was a strong current of 4 1/2 knots which would (and did) catch the starboard bow of the tow, but this was well known and its imminence was the reason the owners of The James L. Richards agreed expressly with Moran to provide a local assisting tug of adequate power. Except for this, the weather was calm and conditions were well nigh perfect.
 
 
 4
 This brought into play the sensible rule that, even though the engagement is in contract so that the duty of the tug toward the tow is that of due care only, with the consequent burden on the tow of establishing negligence, Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; New Orleans Coal & Bisso Towboat Co. v. United States, 5 Cir., 86 F.2d 53, 1937 A.M.C. 86, certiorari denied St. Paul Fire & Marine Ins. Co. v. New Orleans Coal & Bisso Towboat Co., 300 U.S. 676, 57 S.Ct. 669, 81 L.Ed. 881; Stall & McDermott v. Southern Cross, 5 Cir., 196 F.2d 309, 1952 A.M.C. 876; The Clarence L. Blakeslee, 2 Cir., 243 F. 365, a stranding which occurs under circumstances which ordinarily results in no such casualty puts on the tug the obligation of some satisfactory explanation. 'When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. However, circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence. The Steamer Webb, 14 Wall. 406, 20 L.Ed. 774; The Clarence P. Howland, 2 Cir., 16 F.2d 25', Simkins v. R. L. Morrison & Sons, 5 Cir., 107 F.2d 121, 122, 1940 A.M.C. 24; The Marie Palmer, D.C.E.D.Ga., 191 F. 79, 86, affirmed per curiam 5 Cir., 202 F. 1023. 'The burden of explanation was cast upon the tug to account for this apparently unnecessary grounding. The tug proved no fault in the management of the schooner, and gave no reasonable explanation why she did not keep the schooner under control. Upon this showing alone the libelant was entitled to a decree for damages', Burr v. Knickerbocker Steam Towage Co., 1 Cir., 132 F. 248, 250. 'The grounding of the tow called for an explanation. The attempted explanation was the presence of a dense fog, but the tug had to meet the prima facie proof of fault occasioned by grounding her tow by showing now only that she was in a troublesome fog, but that her master did everything a skillful navigator should have done while in a fog to keep the tow in line and to keep it from sagging into the shore as it rounded the bend in the river and was subjected to the impact of an ebb tide.' The Stirling Tomkins, 2 Cir., 56 F.2d 740, 742, 1932 A.M.C. 447; The Reichert Line, 2 Cir., 64 F.2d 13, 14, 1933 A.M.C. 785; The Evelyn v. Gregory, 4 Cir., 170 F.2d 899, 901, 1949 A.M.C. 22; The Anaconda, 4 Cir., 164 F.2d 224, 228, 1947 A.M.C. 1658; Coastwise Transportation Corp. v. United States, D.C.S.D.Me., 43 F.2d 401, 404, 1930 A.M.C. 1689.
 
 
 5
 The explanation could not be found in any providential act since what nature presented was neither sudden nor catastrophic, and, indeed, the expected current was about all that offered much challenge to the reputed professional skill of these towers. The Inca, 5 Cir., 148 F. 363, 365; The Algic, supra; Shasta Steamship Co. v. Great Lakes Towing Co., D.C.W.D.N.Y., 44 F.Supp. 572, 574, 1943 A.M.C. 1205; The Severance, 4 Cir., 152 F.2d 916, 1946 A.M.C. 128; McWilliams Bros. v. Director General of Railroads, 2 Cir., 271 F. 931, 932. If the explanation were to succeed, the tugs had virtually to pin it all on the acts of the tow.
 
 
 6
 This took the form of a joint attack made as true and faithful allies by The Kevin Moran and The Mary B. on the fitness of The James L. Richards' steering gear, claimed unseaworthiness of the barge for being loaded a few inches below her Plimsoll marks, 46 C.F.R., Chapter 1, Section 43.05-1 et seq., the dropping of the wrong anchor, and, as the exigencies of the case demanded, a three-cornered Donnybrook Fair in which The Kevin Moran, asserting that The James L. Richards had failed, as agreed, to supply an adequate helper tug of 1000 horsepower, got aid and comfort from this unexpected quarter as The James L. Richards echoed the charge against Captain Bisso's Mary B.
 
 
 7
 There is little to the charge of overloading since if The James L. Richards was below her marks, this was obviously known as the tow broke ground at Tampa, Florida, four days earlier, and it was this vessel, in this trim, in this shape, which The Kevin Moran undertook to tow, The Fort George, 2 Cir., 183 F. 731; The Inca, supra; The Algic, supra; Shasta Steamship Co. v. Great Lakes Towing Co., supra; The Severance, supra; McWilliams Bros. v. Director General of Railroads, supra.
 
 
 8
 The question of the steering gear, however, was more serious and substantial. For a month before, on the previous voyage, air got into the telemotor hydraulic lines requiring that a broken bleeder cap screw on the top of the hydraulic cylinder be replaced, the air bled out of the system, and the lines refilled with hydraulic fluid. Because of this, the Barge Captain arranged a special signal with The Kevin Moran in the event there was a recurrence of the difficulty. The night before the stranding, about the time the tow arrived ten miles off the Sea Buoy at Southwest Pass, this again occurred when air got into the line. The Barge Captain remedied this by pumping out the telemotor line to purge it of air, refilling the line with fluid and then testing the telemotor and steering apparatus. The next morning the Mississippi River Pilot, informed by the Barge Captain of this previous experience, likewise tested the system and found it in order. The Pilot was emphatic that the tow's failure to make the River turn was not due to steering gear failure, and the testimony was uncontradicted that after refloating, the vessel proceeded to New Orleans without any steering difficulty at which time the system was apparently tested, or at least available for full inspection by adverse surveyors swarming over her, without adverse findings. The renewal in shipyard of leather plungers in the wheelhouse telemotor was explained as merely maintenance replacement of renewable parts. There was certainly nothing conclusive about these facts. The Judge had to decide on probabilities, and we need only say that there was a sufficient basis for his conclusion. C. J. Dick Towing Co. v. Leo, supra.
 
 
 9
 But when it comes to the inference from the admitted fact that the Captain on the fo'c'sle head of The James L. Richards dropped the port, rather than the starboard anchor, as ordered by the Pilot, we think the District Court was in error. The vessel was falling down toward the port. Dropping that anchor would not check, it would accelerate, that movement. This was not the case of a poor choice made under pressing circumstances. The judgment of the expert-- the Pilot-- was correctly formed and timely communicated. The error was mechanical and that without explanation. At that moment, to drop the starboard anchor was both indicated by prudence from the general situation, and the express conclusion of a qualified expert. He thought it was a wise maneuver calculated to help. When it was not executed, he knew it was an error. We agree, and since he (and the erring captain) was the servant of The James L. Richards, the Maria Martin, 12 Wall. 31, 79 U.S. 31, 20 L.Ed. 251; The Merrimac, D.C.Or., Fed.Cas.No. 9,478; The Thomas Wilson, D.C.N.D.N.Y., 124 F. 649; Benedict on Admiralty, 5th Ed., Section 100, page 200, as these judgments coincide, it casts The James L. Richards for part of the blame.
 
 
 10
 But it is evident that as the tugs make out this much of an 'explanation', it does not exonerate them altogether for this fault of The James L. Richards was failure to take a proper and indicated step after the vessel was in obvious difficulty. Something caused The James L. Richards to forge on ahead without swinging as intended. But nothing in the evidence of the 'explanation' implicates the tow in this. The explanation for this inexcusable stranding not being forthcoming, the case, at least so far as The Kevin Moran is concerned, ends as it began with the tug shouldering the consequences of this inadequacy. To this can be added record evidence affording an ample basis for the conclusion that the Pilot and Master of The Kevin Moran in charge of the flotilla did not lay out a coordinated plan with clear indication of responsibilities and duties of each of the tugs. An illustration of this is the strong opinion by The Captain and Pilot of The James L. Richards that the tug Mary B. ought to have been on the port, not the starboard, quarter, but each labored under the impression that the Master or Pilot of The Kevin Moran had fixed that position while each of these, though specifying the starboard quarter, meant this to be a decision for The James L. Richards. Likewise, the Court may well have thought that The Kevin Moran's Pilot was too much preoccupied with his own position and too little occupied with the tracking of the tow as they approached and would go into the turn.
 
 
 11
 Nor is The Mary B. to be exonerated even though we think, in some of his reasons for imposing liability on her, the District Judge made a mistake. If it was a fault for The Mary B. to be on the starboard, not the port quarter, or proceed under full ahead on approaching the intersection of the Outer and Inner Ranges thus leaving no 'reserve' power for emergencies, this was not attributable to The Mary B. For obviously, her position was that of a helper, assisting tug, and her duty was promptly to execute the order of the tow's commander, or here, the person in charge of The James L. Richards. Chaos would indeed prevail if a helper tug either did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done, see, e.g., The Barranca (The San Pasqual), D.C.La., 20 F.2d 192, 1927 A.M.C. 1208, affirmed Old Time Molasses Co. v. United States, 5 Cir., 31 F.2d 963, 1929 A.M.C. 687; Moran Towing & Transportation Co., Inc., v. Empresa, Hondurena De Vapores, 5 Cir., 194 F.2d 629, 1952 A.M.C. 592; The Stella, 5 Cir., 278 F. 939.
 
 
 12
 But this is short-lived comfort, for we think that Bisso breached its undertaking with the owner of The James L. Richards to furnish a helper tug of a rated horsepower of at least 1000. The pleadings were categorical and Bisso's efforts as a witness to extricate himself were unconvincing if not altogether incredible in view of the experience and prior dissatisfaction with The Mary B. on the previous voyage. Bisso fares no better on proof of horsepower. By agreement of all parties, the Court used a panel of nautical experts who calculated the power of this triple-expansion reciprocating steam engine. With fuel lines and steam lines to H.P., I.P., and L.P. cylinders in normal position, the maximum horsepower was calculated by them to range from 827 to 853. With the by-pass to the H.P. cylinder open and the fuel supply simultaneously increased through the fuel by-pass, the maximum could be increased to range from 1103 to 1275 horsepower. But this was not the bargain. The agreement was for a tug of 1000 horsepower or better and we would interpret that to mean in its usual, normal operating condition. The wisdom of this is shown by the evidence here which raises considerable doubt that, when The James L. Richards' Pilot called for full ahead, the by-passes were closed, and the fuel increased. The engineer on watch denied that he had done so, and Bisso's struggle to explain this as a misapprehension by this witness, resulting from a too effective or misleading cross examination, that this would be acknowledging a violation of Coast Guard rules to admit using bypasses, reflects, at best, a fluid concept of truth. Bisso made an express agreement which it failed to keep. Warranting, in effect, the horsepower, the fitness of the tug was no longer to be determined by judge-made standards of the trade, e.g., Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 4 Cir., 101 F.2d 30, 32, 1939 A.M.C. 58; Standard Oil Co. v. Shipowners' & Merchants' Tugboat Co., 9 Cir., 17 F.2d 366, 368, 1927 A.M.C. 427, and power, being of critical importance in the jaws of an imminent stranding, it is the warrantor who runs the risk of non-persuasion.
 
 
 13
 The decrees dismissing the claims of The Kevin Moran and The Mary B. for towage, contract and maritime salvage, the decrees adjudging The Kevin Moran and The Mary B. each liable for one-half of the damages and losses proximately caused by the stranding are reversed and modified to adjudge The James L. Richards, The Kevin Moran and The Mary B. equally liable for one-third of all such damages and losses, and as modified the case is remanded for further and not inconsistent proceedings.
 
 
 14
 Decrees reversed, modified and remanded.