## THE J. C. HART.
## THE HENDRICK HUDSON.

District Court, E. D. New York.
July 7, 1930.

The Robert Fulton (C. C. A.) 187 F. 107, 108.

"It cannot be expected that vessels will so manage their work, as to receive extraordinary swells without harm. The vessel making such swells is responsible for their effects upon innocent vessels." The Hendrick Hudson (D. C.) 163 F. 862, 865.

We can now pass to the facts in this case.

In the afternoon of May 22, 1925, a clear bright day, the tug Hart was proceeding down the Hudson river with four grain barges in tow. These barges were all alike. They each had square bow and stern, about 108 feet long, 22 feet wide, 13 feet deep, drawing about 10 feet, and were loaded with wheat. They were in two tiers, on hawsers from the tug of about 300 feet. The first two barges were the Frank Egan and the Agnes Murray. Behind them were the Juliette Egan and the Jack Egan. I can find no fault in the manner in which this tow was made up. The proper towing lines and cross lines were in use. On each of the barges was a barge man.

The tug and her tow had, a considerable time before, left Albany and was bound for Fifty-Second street, New York City.

When this tow reached a point in the river between Stony Point and Rockland Lake it was overtaken by the large river steamboat Hendrick Hudson.

This steamboat is a side-wheeler, 400 feet long, about 62 feet wide, draws about 8 feet when light, and more when loaded. She is capable of making 20 miles an hour at full speed. Her half speed is 12 miles, while her dead slow speed, necessary to keep steerageway, is 6 miles. I think it is shown that she was capable of causing swells dangerous to other vessels under certain conditions.

The testimony of Gilman, master of the barge Murray, and of Sickles, captain of the Hendrick Hudson, and of certain others, was taken by deposition. At the trial other witnesses, such as the captain of the Hart, and an expert for the steamboat, were offered. The substance of the testimony for the Hendrick Hudson does not come from eyewitnesses and what was seen and done, but relies on inferences to be drawn from logbooks coupled with expert opinion as to size of swells, etc. The officers of the steamboat frankly conceded that they had no personal recollection of this occurrence.

The captain of the Hendrick Hudson stated that he had "no recollection of pass-

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for libelant.

Otto & Lyon, of New York City (John A. Lyon, of New York City, of counsel), for the J. C. Hart.

Hatch & Wolfe, of New York City (Carver W. Wolfe, of New York City, of counsel), for the Hendrick Hudson.

INCH, District Judge.

Libelant owns several barges and claims that they were injured by the careless navigation of the river steamboat Hendrick Hudson whereby excessive swells were created by that vessel, causing the barge to collide, and by the tug Hart in charge of the tow.

I am convinced that there was damage done to these barges. The extent of this damage is not necessary now to determine.

For years the courts have been called upon to pass upon damage cases arising from such cause, and apparently they are becoming increasingly prevalent in view of the crowded condition of the waters around New York Harbor and with the advent of many very large and fast steamers.

While the slow but most important freight bearing barges and tows occupy an indispensable place in the commercial world, the ordinary duty which has always rested upon those in charge of these barges and tows must meet these conditions.

The law applicable to the facts of this case is plain and but a brief reference is necessary.

"Both the steamer and the tow had a right to navigate the river; it being the duty of the tow to meet the ordinary risks of navigation and of the steamer not to injure a tow so constituted by her swells."

ing the tow." "We passed between 1000 and 1500 tows in a season."

While interesting and most persuasive in the absence of other testimony, it is not necessary to consider the expert opinion as to the ability of the Hudson to create swells, for the reason that I prefer to take the eyewitness' testimony for libelant and that of Miller, captain of the tug Hart. From this testimony I am satisfied that the Hendrick Hudson approached this tow with full knowledge of its presence and the danger that might be occasioned by swells produced by a careless rate of speed and close passage.

Gilman says, "She (the Hendrick Hudson) was coming full headway and she went by so fast that it drawed the boats together with such force that it broke the planks."

In another place he testifies: "When she (the Hendrick Hudson) was going by she went by so fast and it was shallow water and it drawed the boats together back and forth three or four times. They jumped up and down and surged like for about five minutes."

Two of the cross lines on the Murray and one on the Frank Egan broke. These were 4½-inch lines.

Miller, captain of the Hart, an experienced tug captain, testified that in his opinion the Hudson was going 14 miles an hour, nor was he shaken by cross-examination on this point. To be sure Miller and Gilman do not agree as to the depth of water, Miller claiming that it was deep, while Gilman that it was shallow and also stating that the depth of water made a difference. "They won't surge so much." But, considering all the testimony on this point, I am satisfied that this case comes within the decision of The Asbury Park (D. C.) 138 F. 617, where Judge Thomas, at page 618, sums up his conclusions which I think are applicable to this case before me. Yet I do not think that this is all to this case.

While those in charge of the Hendrick Hudson in this instance were negligent and by that negligence caused damage to the barges of libelant, it seems to me that those in charge of the barges were guilty of contributory negligence.

In other words, with this well-known danger, familiar to every barge captain of any experience, it is the duty of a barge captain when he can, and if a reasonable time is afforded him, to slack his lines and avoid, so far as possible, the running of barges on to each other.

It is apparent here that the damage was occasioned in this manner. The sterns and bows of the front and back tiers were what was damaged. The front and rear tiers collided. The make-up of a tow for this reason has sometimes been criticized where barges have been carelessly placed too close together. La Savoie (D. C.) 157 F. 312; The St. Paul (D. C.) 171 F. 606.

That criticism, in this case, does not apply here, for the testimony indicates that they were a reasonable distance apart. They were 6 or 7 feet away from each other, although possibly slightly less owing to the ease with which Gilman testified he crossed to the various barges.

Therefore, although I do not think that this tow was improperly made up to meet the condition here shown, this is entirely different from saying that when conditions changed these barge men were not required to use due care to slack their lines.

That this is so is made evident by the testimony of Gilman, the master of the barge Agnes Murray, the sole eyewitness offered by libelant. He says that on the many trips up and down the river "if the wind blows or if it is rough we slack them up (the lines) and when it is nice we take them in." This is what he should have done.

It seems to me that it makes very little difference whether the water becomes rough from one cause or another, and that some attempt at least should have been made by these barge men to protect the bow and stern of their barges from unnecessary collision. A reasonable time was given them to do so in the presence of a plainly to be apprehended danger.

The only barge man on deck of these four barges and attending to his duty was Gilman; yet he states that he simply stood on deck, and: "I see the Hendrick Hudson coming. It was nice clear weather. I heard the Hudson blow when she was ¼ mile away. I was looking at her it was 3 or 4 minutes before she passed. I have been working on the river 40 years. I knew the water was shallow at this place. When she was ½ mile astern I heard her blowing to some tug. She always throws out heavy swells—always did—and that depends on where they pass the tow, whether they pass you in deep water and other times in shallow water. The nearer she got the more the boat surged and when she got opposite they started to hit one another. When the boat hit they, (the other captains) came out."

Under such conditions, and where the damage was caused by these tiers colliding with each other, it is evident that this damage would not have been as serious and to some extent even avoided if the lines had been slackened as Gilman admits the duty was to do in "rough water."

Certainly there is every evidence that there was ample time for Gilman either to notify the other captains of the approach of the Hendrick Hudson, or at least to attend to his own boat; but instead of that these other captains did nothing, and Gilman simply watched the approach of the Hudson, although well aware of the danger as the others should have been.

To be sure there was no necessity for assuming that those in charge of the Hendrick Hudson would also be careless, but, on the other hand, there was no right for those in charge of these barges to take a chance, and in this respect they were each, in my opinion, contributorily negligent.

I fail to find any proof of any neglect of duty on the part of those in charge of the tug Hart. The tows were properly made up, and I believe Captain Miller when he states that the Hendrick Hudson passed about 500 or 600 feet away and that he did not slow down.

Accordingly, I dismiss the libel against the tug Hart and decree that libelant recover against the Hendrick Hudson, damage to be divided.