## COASTWISE TRANSP. CORPORATION v. UNITED STATES.

### THE TRANSPORTATION.

### THE PENACOOK.
#### No. 73.

District Court, D. Maine, S. D.
Aug. 8, 1930.

402

Nathan W. Thompson, of Portland, Me., for libelant.

William B. Nulty, Asst. U. S. Atty., of Portland, Me.

HALE, District Judge.

In this suit, brought under the Public Vessels Liability Act (U. S. Code Annotated, title 46, chapter 22, § 781; Act of March 3, 1925, § 1) the Coastwise Transportation Corporation, owner of the steamship Transportation, seeks to recover damages alleged to have resulted from the grounding of that steamship in Portsmouth Harbor, N. H., on September 11, 1925, while in tow of the United States Navy tug Penacook. The statute under which this suit is brought (section 781, 46 USCA [Act March 3, 1925, § 1]) provides:

"A libel in personam in admiralty may be brought against the United States, or a petition impleading the United States, for dam-

ages caused by a public vessel of the United States, and for compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States: Provided, that the cause of action arose after the 6th day of April, 1920."

Section 782, 46 USCA (Act March 3, 1925, § 2), provides:

"Such suit shall be brought in the district court of the United States for the district in which the vessel or cargo charged with creating the liability is found within the United States. * * * Such suit shall be subject to and proceed in accordance with the provisions of chapter 20 or any amendment thereof, in so far as the same are not inconsistent herewith. * * *"

Chapter 20 of title 46 (sections 741–752), referred to, contains the Suits in Admiralty Act, which substitutes a remedy in personam against the United States for a remedy in rem.

In The Minnesota (D. C.) 20 F.(2d) 926, 928, Judge Burns of the Louisiana District stated the law on the subject.:

"The courts have repeatedly held that the Suits in Admiralty Act merely substitutes a remedy in personam, upon in rem principles, for a remedy in rem against the vessel, when owned by the government. Otherwise the status of the government is precisely that of a private owner. * * * No more personal liability attaches to the United States, as owner, than would attach to a private owner." See U. S. v. Neptune Line (C. C. A.) 12 F.(2d) 568, citing The Barnstable, 181 U. U. 464, 21 S. Ct. 684, 45 L. Ed. 954, and certain other cases.

The effect of the act appears to be merely to substitute a right of action in personam against the United States for an action in rem against the vessel in order to obviate the inconvenience to the government of seizure of its ships. The Falcon (D. C.) 19 F.(2d) 1009.

It follows then that if the proofs in the case before me are such that the Penacook would have been liable in rem had she been privately owned, the government should be held to be at fault.

The libelant alleges that the Penacook undertook to render a towage service; that she was hired for doing such service, and that she performed such service negligently, whereby the Transportation stranded and suffered damages; and that the libelant did not in any way contribute to such damage.

The respondent asserts that the govern-

ment tug assumed the duty only of assisting the steamer to dock, and did not assume the duty of acting as a pilot, and did not undertake to perform a towage service; that it had no orders to take charge of the steamer; and that the master of the steamer did not inquire as to who was to take charge of the boat, or whether the captain of the tug was capable of taking the steamer up the river.

The respondent alleges further that the towing company at Portsmouth which was accustomed to do the dockage and pilotage work in the harbor was unable to supply a towboat on the day in question because of the fact that its two towboats were in use; and that sometimes when both towboats were in use, the towboat company was able to secure the services of one of the government tugs stationed at the Kittery Navy Yard; that the tug was furnished by the Consolidation Coal Company and that the libelant was acquainted with this fact; that the Consolidation Coal Company arranged with the Navy Yard to send a tug to assist in the docking of the steamer; that the coal company and the agent of the consignee and the agent of the Navy Yard knew that the government tug Penacook was to be used only to assist the steamer in docking; that they knew that no pilot was furnished, and that the Navy tug was chartered solely to assist the steamer in docking.

The record shows that the Transportation left Hampton Roads with a cargo of from 6,600 to 6,700 tons of coal, bound for Portsmouth, N. H., where the coal was to be delivered to the Consolidation Coal Company. At the time the steamer arrived off Portsmouth, it being thick weather, the steamer was anchored off the entrance to the harbor. Later in the day, the weather clearing, she moved into the harbor and anchored, at about 2:45 p. m. daylight saving time, off Steilman Rocks to wait for a tugboat, as Captain Babbitt says. About 3 o'clock p. m. the Navy tug Penacook came alongside. It appears from the proofs that Webber, the naval officer in charge of the Penacook, boarded the Transportation and told her master, Captain Babbitt, that he had instructions to take the Transportation up to her dock at Portsmouth. Webber does not in terms deny that he said this. Alfred Stanley, manager for the consignee, testified:

"Q. 8. And did you have any conversation with Mr. Webber on the way down? A. Yes.

"Q. 9. What was it? What was said? A. Why, all I remember is of asking him his position, and about the boat; spoke of the tug we were on. And I understood from him that he was going down and act as pilot and was to bring up this boat.

"Q. 10. He said that he was to bring up the Transportation? A. Yes.

"Q. 11. And when you arrived at the Transportation you went aboard that vessel and you went up on the bridge? A. Yes, sir.

"Q. 12. And on the trip up who gave the orders? A. Why, the Navy officer.

"Q. 13. That is, Mr. Webber? A. Mr. Webber. Yes.

"Q. 14. Did Captain Babbitt give any orders that you heard? A. No. I couldn't hear him give any orders. * * *

"XQ. 8. So, when you say Mr. Webber was in charge, how did you know that? A. Because he invited me on to the bridge and gave the orders.

"XQ. 9. What orders did he give? A. I couldn't recall the orders—the Naval terms— I am not acquainted with the Navy enough for that. I heard the word 'starboard,' and whatever he said would be repeated by the man back of there, at the wheel."

Captain Babbitt testified:

"Q. 36. And, after the Naval officer had said that he had instructions * * * that he had been instructed to take you up to the dock, what did you say or do? A. Well, I says—I asked him if he wasn't a little late on the tide. He said, 'Oh, no. I can take her up all right.' I said, 'All right, then. We'll go ahead.'

"Q. 37. Then tell what happened. A. I ordered the anchor hove up, and he took charge.

"Q. 38. He took charge? A. Yes, sir. * * *

"Q. 59. Now, on the trip up, who gave the orders to the wheel? A. The commanding officer of the tow-boat.

"Q. 60. Who gave the orders to the engine-room telegraph? A. The commanding officer of the tow-boat.

"Q. 61. Who was handling the telegraph? A. I was.

"Q. 62. Did you give any orders whatsoever about the handling of the ship? From the time you got under way up until the time that the ship grounded? A. No, sir.

"Q. 63. During that period all the orders were given by the commanding officer of the tow-boat? A. Yes, sir."

I cannot find that Webber denies that he took charge and gave all orders. He testi-

fies, however, that he looked around for the captain and could not see him, and that he continued to give the orders until the vessel grounded. At no time did he ask the captain to take charge of the ship up to the time of grounding.

From the proofs I am compelled to find that Webber was in charge of the navigation of the tug and the steamer.

At about half past 3, the Transportation grounded on Gangway Rock, and remained stranded until about 4:25, when she was floated and proceeded back down river and anchored in the lower harbor. While the Transportation was aground, a Navy launch from the Navy Yard came out and ordered Webber to take the steamer back to the lower harbor. This appears from the testimony of Captain Babbitt, which is not denied by Webber.

It is clear from examination of the chart that the place where the steamer grounded was outside the channel. The draft of the steamer was 23 feet forward and 26 feet aft, and the depth of the water where she grounded was 19 feet. The testimony is clear that the vessel was not in the channel, and if she had been in the channel she would not have grounded. Webber's testimony is to the effect that if she had been further over to starboard and in the channel she would not have grounded; and he says he was aware of Gangway Rock.

■■ From the proofs I am constrained to find that the tug assumed towage duties; and that the service was not merely one of assistance in docking. I think that Webber was clearly in charge of the navigation of the tug at the time of the grounding. It is well settled in admiralty law that when a tug grounds her tow on a well-known and charted shoal there is a presumption that the accident was due to the negligence of the tug. In Consolidated Coal Co. v. Knickerbocker Steam Towage Co., 200 F. 840, this court found that the circumstances connected with the grounding of a ship puts the burden upon the tug to explain the reason of the grounding. In Burr v. Knickerbocker Steam Towage Co., 132 F. 248, 249, Judge Brown, in speaking for the Circuit Court of Appeals in this circuit, said:

"When the libelant proved that the moving of the vessel was in sole charge of the tug, that the schooner's wheel was hard aport, and that on a summer afternoon, with a light breeze and moderate tide, and with nothing to prevent the tug from having such full control of the schooner as would keep her in deep water, she was so towed that she came up on the westerly shore, or upon a well-known rock, before she had gone more than three or four lengths, a prima facie case of negligence was established. * * * The burden of explanation was cast upon the tug to account for this apparently unnecessary grounding. The tug proved no fault in the management of the schooner, and gave no reasonable explanation why she did not keep the schooner under control. Upon this showing alone the libelant was entitled to a decree for damages." The Wyomissing (C. C. A.) 228 F. 186; The Marie Palmer (D. C.) 191 F. 79, 86.

In the case at bar the proofs fail to show any excuse offered by the respondent for the stranding. Webber testified:

"XQ. 32. Now, it is quite clear, isn't it, Mr. Webber, that if the ship had been further over to her starboard, out in the middle of the channel, that no grounding would have occurred? A. Certainly. Lots of water out there. But the tide was making. And the undertow is a great deal stronger than the surface tow.

"XQ. 33. Well, if the ship had been out in the middle of the channel she wouldn't have grounded? A. No, if there had been plenty of water under her she wouldn't. No."

■ It cannot be held that any excuse can be found in the fact that the tide drifted the vessel over and caused her to ground. Tugboats and their masters who assume the duty of towing must know tides and currents and make proper allowance for them.

Captain Babbitt states the cause of the grounding: "I don't think he backed his towboat quick enough to throw the ship's bow to starboard to hold her over on the starboard side of the channel."

In The Coastwise, 233 F. 1, 4, the Court of Appeals in this circuit said:

"In the case before us, as in the case of The Webb [14 Wall. 406, 20 L. Ed. 774], supra, the departure of the tug from her true course was enough to devolve upon her the duty of explanation. Under no stress of storm, she ran upon a well-known, well-charted shoal. She shows no operating cause, or accident, sufficient to produce the disaster; she has made no satisfactory explanation. The proofs show that there was nothing to prevent a mariner in the exercise of careful seamanship from keeping out to sea far enough to escape danger."

See, also, Consolidated Coal Co. v. Knick-

erbocker Steam Towage Co. (D. C.) 200 F. 840.

In The Pejepscot, 217 F. 150, 152, this court said:

"If the duty undertaken by him is difficult he must use commensurate care and skill. The Margaret, 94 U. S. 494, 496, 24 L. Ed. 146; The L. P. Dayton, 120 U. S. 337, 351, 7 S. Ct. 568, 30 L. Ed. 669. Negligence is a question depending upon the circumstances of each case, and can rarely be absolutely defined as a matter of law. The case at bar presents some unusual features. From a careful study of the testimony, I am of the opinion that the master of the tug did not use the care which he should have used in the difficult service undertaken. * * * I am of the opinion that the tug must be held solely at fault."

In the case before me the proofs show that the steamer was caused to strike a well-known and well-charted rock when there appeared to be no extraordinary conditions existing.

I cannot sustain the contention of the respondent that the master of the tugboat assumed a responsibility beyond the limits of his employer's duty. The proofs tend to show that he was conducting the duties of a towboat. It appears that he was acting for the Consolidation Coal Company performing a certain service; but the record fails to show that he was not acting in the ordinary course of towing duties; and I think that the towboat's liability cannot be limited to the amount received in the regular course of business by the towboat company.

The learned counsel for the government brings to my attention the case of The J. J. Timmins (C. C. A.) 213 F. 211, 213. In that case the Circuit Court of Appeals for the Second Circuit, Judge Ward speaking for the court, found that the libelant had not sustained the burden of proof resting upon it to show that the navigation of the vessel had been in charge of the tugs or that the tugs had caused the stranding. A steamer took a sheer and stranded. There were three tugs made fast to her; but the court found that the tugs were not towing. The court found, also, that the master of the steamer, and not the tug master, was in charge. The case before me does not disclose the same facts; but it does disclose that Webber, the tug master, was in charge in fact. In the course of his opinion Judge Ward said:

"No doubt, as the tugs naturally accompanied the steamer to her berth, if she got into trouble on the way, they would have assisted her. If any tug did so negligently, either at the order of Capt. Howe or on her own motion, that tug would be responsible in rem, although acting gratuitously."

In the case before me the learned counsel urges with much force that the case involves hardships for the government from the fact that the libelant cannot be limited to the contract arrangement, made for the use of the tug, which was $25 per hour; but I should not be in accord with the principles of maritime law if I should establish the precedent that the libelant must be held to that sum as the measure of damages.

The respondent in its answer contends that sufficient lookout was not maintained upon the steamer. The proofs do not in my opinion give ground for this contention.

Upon all the proofs I am constrained to find that the respondent was in fault; and that the libelant was not in fault. A decree may be presented to this effect, but without costs. The case is referred to Albert B. Hall, Esq., to report to the court on the question of damages.