**CANADIAN AVIATOR, Limited, v. UNITED STATES.**

No. 8429.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 18, 1943.

Decided May 2, 1944.

Eugene Underwood, of New York City (Shields, Clark, Brown & McCown, of Philadelphia, Pa., and Burlingham, Veeder, Clark & Hupper, Roscoe H. Hupper, and Chauncey I. Clark, all of New York City, on the brief), for appellant.

J. Frank Staley, of Washington, D. C., for appellee.

Before BIGGS, MARIS, and JONES, Circuit Judges.

MARIS, Circuit Judge.

Canadian Aviator, Limited, the owner of the steamship Cavelier, filed a libel in the District Court for the District of New Jersey seeking to recover $75,000 from the United States under the Public Vessels Act, 46 U.S.C.A. § 781, for damages alleged to have been sustained by the Cavelier. The respondent prayed that the libel be dismissed upon the grounds that it failed to state a cause of action within the provisions of the Public Vessels Act for which the United States has consented to be sued. The district court dismissed the libel for want of jurisdiction.

The district courts, of course, have no jurisdiction of a suit against the United

States unless the United States has consented to be sued. United States v. Sherwood, 1941, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058. The libellant contends, however, that consent to the present suit has been given by Congress in the Public Vessels Act. Section 1 of that act, 46 U.S. C.A. § 781, provides:

"A libel in personam in admiralty may be brought against the United States, or a petition impleading the United States, for damages caused by a public vessel of the United States, and for compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States: Provided, That the cause of action arose after the 6th day of April, 1920."

This statute, the libellant urges, is applicable to the facts of the present case.

The libel in the case before us avers that the United States was the owner of the patrol boat YP 249, a public vessel in the service of the United States Navy; that the Cavelier while en route from Canada to Jamaica received orders from the United States naval authorities to enter the Delaware Bay; that upon approaching the bay she received instructions from the naval authorities that the YP 249 would precede her through the waters of the entrance to Delaware Bay and received orders from such authorities to follow directly astern of the YP 249; and that pursuant to these orders "the Cavelier proceeded directly astern of the YP 249 and attempted as ordered to enter Delaware Bay following directly astern of the YP 249 but about 9:30 p.m., while proceeding directly astern of YP 249 as ordered, the Cavelier struck a submerged wreck and sustained serious damages." It is thus averred, says the libellant, that the damages were caused by a public vessel owned by the United States, a cause of action for which the United States has waived its sovereign immunity and for which it has consented to be sued in personam in admiralty.

■ The question which we must determine, therefore, is whether the damage to the Cavelier can be said, upon the libellant's averments, to have been "caused by a public vessel," the YP 249, within the meaning of the Public Vessels Act. In determining this question we must bear in mind that the act, being the relinquishment of a sovereign immunity, must be strictly interpreted. United States v. Sherwood, 1941, 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058; Schillinger v. United States, 1894, 155 U.S. 163, 166, 15 S.Ct. 85, 39 L.Ed. 108.

■ Since the phrase "caused by a public vessel" is not further defined in the act, it is appropriate to seek the legislative intent in its usage. State of Maine v. United States, 1 Cir., 1943, 134 F.2d 574. The Committee on Claims of the House of Representatives had this to say in its report[1] as to the purpose of the bill (H.R. 9535) which became the Public Vessels Act:

"The chief purpose of this bill is to grant private owners of vessels and of merchandise a right of action when their vessels or goods have been damaged as the result of a collision with any Government-owned vessel, though engaged in public service, without requiring an application to Congress in each particular instance for the passage of a special enabling act."

"Shipowners, whose vessels have suffered a collision with any Government-owned ship in the public service and who have a cause of action under existing procedure, must apply to Congress for the passage of a special enabling act before suit can be brought in the admiralty courts."

In a portion of the report devoted to the legislative history of governmental immunity the Committee on Claims stated:

"The only general legislation covering the subject matter of the pending bill is the provision embodied in the act of December 28, 1922, authorizing the Secretary of the Navy to adjust claims involving not more than $3,000. This latter is, of course, wholly inadequate, since the damages in collision cases are usually very large in amount."

In dealing with the law in other countries as to the right to sue the sovereign in cases such as that sought to be covered by the proposed bill the report stated:

"Wholly apart from the petition of right, a simple and efficacious method of relief is available in England for the very claims now under consideration. In the case of a collision between a British public

---

[1] House Report No. 913, 68th Cong., 1st Sess.

vessel and the ship of a subject or a foreigner, it is the established English practice to permit the private owner to begin suit in the English courts against the navigating officer of the Government vessel. As a matter of course, the solicitor for the treasury appears on behalf of the respondent. The case is tried as if between private parties, with similar rights of appeal to either litigant. If it is shown that the public vessel, through her navigators, was at fault, the Government, after judicial assessment of the damages, pays the loss sustained by the private owner."

Attached to the report and made a part of it are letters from Secretary of State Charles E. Hughes, Acting Secretary of the Navy Theodore Roosevelt, Jr., Secretary of the Treasury Andrew W. Mellon, Secretary of War John W. Weeks, Attorney General Harlan F. Stone and Secretary of Commerce Herbert Hoover written to the Committee on Claims in response to a request as to their views upon a proposed bill (H.R. 6989, 68th Cong., 1st Sess.) authorizing suits against the United States in admiralty for collisions caused by public vessels belonging to the United States. H.R. 6989 was an earlier bill which was supplanted by H.R. 9535. Each writer expressed himself as being in favor of an act authorizing suits against the United States in cases of collisions with public vessels of the United States. Except for claims for towage and salvage services for which the bill also provided, the discussion of the cabinet officers dealt solely with collision claims. We do not find the faintest suggestion either in the correspondence or in the report itself that the bill would effect a general waiver of the sovereign immunity from suit on all claims for damages resulting from the negligence of the personnel of a public vessel even though the vessel itself was not the physical instrument which did the injury. The House Committee report, with its accompanying correspondence,

was adopted in toto by the Committee on Claims of the Senate as its report.[2]

■ The libellant points out that, whereas the earlier bill (H.R. 6989) was limited in terms to suits for *collisions* caused by public vessels, the bill finally enacted (H.R. 9535) authorized suits for *damages* caused by such vessels. It argues that the change in phraseology indicates a Congressional intent to cover a field of damage claims broader than those arising solely from collisions. We think that this change in the phraseology of the bill was intended to extend the waiver of immunity beyond cases of actual collision to those cases in which the vessel is the physical cause of the injury even though it does not come into actual physical contact with the injured object.[3] We are satisfied, however, that Congress did not intend by the act to extend the waiver of immunity beyond those cases in which the vessel itself was the physical instrument by which the damage was done. The fact that the Congressional committees appended the correspondence regarding H.R. 6989 to their reports on H.R. 9535 is strong evidence that they did not consider that the latter bill was substantially broader than the former one. Certainly if Congress had contemplated that H.R. 9535 would permit suit against the United States for all damages resulting from the negligence of naval personnel aboard public vessels it would not have used this correspondence as it did, but would have submitted the new bill to the department heads for their views upon the desirability of such a radical departure from historic sovereign immunity.

In using the phrase "damages caused by a public vessel" Congress was not using language unfamiliar to the law. In the case of The Vera Cruz (No. 2), 9 L.R. Prob.Div. 96 (1884), the English Court of Appeal was called upon to construe the meaning of the phrase "damage done by any ship" in the English Admiralty Court

[2] Senate Report No. 941, 68th Cong., 2d Sess.

[3] Thus in Coastwise Transp. Corporation v. United States, D.C.Me.1930, 43 F.2d 401, recovery was permitted for damages to a vessel pushed or pulled onto a reef by the navy tug which had her in tow. In The Harding Highway, 3 Cir., 1931, 53 F.2d 938, recovery was allowed against the United States upon proof that the United States dredge W. L. Marshal in attempting to pass the ferryboat Harding Highway occupied more than her share of the channel and crowded the ferryboat so that it struck a stone jetty and sustained damage. In McCormack Sand & Gravel Corporation v. United States, D.C.N.Y.1938, 1938 A. M.C. 1569, recovery was permitted for damages to scows which resulted from swells negligently set up by a United States destroyer.

Act of 1861. In that case the Master of the Rolls said (p. 99):

"In 1861 came the Act with the words 'any claim for damage done by any ship,' and in 1862 there was the case of The Malvina (Lush. 493), wherein Dr. Lushington stated that, the 7th section of the Act of 1861 was passed for the purpose merely of including damage done *by* a ship. With that view I agree. The section indeed seems to me to intend by the words 'jurisdiction over any claim,' to give a jurisdiction over any claim in the nature of an action on the case for damage done by any ship, or in other words, over a case in which a ship was the active cause, the damage being physically caused by the ship. I do not say that damage need be confined to damage to property, it may be damage to person, as if a man were injured by the bowsprit of a ship. But the section does not apply to a case when physical injury is not done by a ship."

In the same case Judge Bowen said (pp. 100, 101):

"Shortly, the question is, whether this is a claim for damage done by a ship, and I think that the history of the law on this point proves that it is not. Apart from that, however, the obvious meaning of the Act leads to the same conclusion—for the Act gives a claim for compensation for damage done by the ship—this, and this only, is the cause of action. 'Done by a ship' means done by those in charge of a ship, with the ship as the noxious instrument."

In the case of The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 487, 47 L.Ed. 760, the Supreme Court had under consideration the meaning of a Wisconsin statute which provided that every ship, boat or vessel navigating the waters of that state should be liable "for all damages arising from injuries done to persons or property by such ship, boat, or vessel." The suit was by a seaman who had been injured by reason of an improvident and negligent order of the master in respect of the navigation and management of the vessel. The court said, pages 176, 177 of 189 U.S., page 487 of 23 S.Ct., 47 L.Ed. 760:

"But the vital question in the case is whether the damages arose from an injury done to persons or property *by such ship,* boat, or vessel. The statute was doubtless primarily intended to cover cases of collision with other vessels or with structures affixed to the land, and to other cases *where the damage is done by the ship herself, as the offending thing* [emphasis supplied], to persons or property outside of the ship, through the negligence or mismanagement of the ship by the officers or seamen in charge. * * *

"The act in this particular uses the same language as the 7th section of the English Admiralty Court Act of 1861, which declares that 'the high court of admiralty shall have jurisdiction over any claim for damage done by any ship.' Construing that act, it has been held by the court of admiralty that it applies to damages occasioned by a vessel coming in collision with a pier, The Uhla, L.R. 2 Adm. & Eccl. 29, note, and also to cases of personal injury, The Sylph, L.R. 2 Adm. & Eccl. 24, where a diver, while engaged in diving in the river Mersey, was caught by the paddle wheel of a steamer and suffered considerable injury; but not to a case where personal injuries were sustained by a seaman falling down into the hold of a vessel, owing to the hatchway being insufficiently protected, The Theta [1894] Prob. 280, or to loss of life, The Vera Cruz, L.R. 9 Prob. Div. 96. As we have indicated above the statute was confined to cases of damage done by those in charge of a ship *with the ship as the 'noxious instrument,'* [emphasis supplied] and that cases of damages done on board the ship were not within the meaning of the act of damages done *by the ship.*"

We think that Congress in enacting the Public Vessels Act likewise had in mind the concept that the phrase "caused by a public vessel" meant caused by those in charge of the vessel, with the vessel as the 'noxious instrument' by which the injury is physically done. Our conclusion in this regard is supported by two decisions of the Circuit Court of Appeals for the Second Circuit. O'Neal v. United States, D.C.E.D.N.Y., 1925, 11 F.2d 869, affirmed 2 Cir., 1926, 11 F.2d 871; Dobson v. United States, 2 Cir., 1928, 27 F.2d 807.

The libellant strongly urges that this is too narrow a construction to be placed upon the statute, that under the ancient rule in the admiralty a vessel is personalized and must answer as a jural personality for the negligence of her officers and crew, and that it was in this personalized sense that Congress referred

to the vessel as causing damage. While it is true that a ship is ordinarily thus personalized in the admiralty it does not follow that Congress intended by the Public Vessels Act to endow the public vessels of the United States with such a personality.

The fiction of the ship as a jural personality arose in the admiralty as an expression of the principle that one who has a contract, to which the ship is bound and which is breached, or who, through the instrumentality of the ship, has suffered a wrong that is within the maritime jurisdiction, shall have by way of security or redress, an enforceable interest in the ship. 1 Benedict on Admiralty, 6th Ed. § 11. The interest thus given is known as the maritime lien and by its enforcement the ship answers for its liabilities whether in contract or tort. Thus the personalization of a ship has no significance in the absence of an enforceable maritime lien. It is only in the enforcement of such a lien by a proceeding in rem against the vessel that this legal fiction may be invoked.

The Public Vessels Act, however, in Section 8, 46 U.S.C.A. § 788, expressly provides that nothing in the act "shall be construed to recognize the existence of or as creating a lien against any public vessel of the United States." Section 1 of the act, as we have seen, authorizes the filing of a libel in personam against the United States. The act does not authorize a proceeding in rem against a public vessel and any possibility of such a proceeding is negatived by the express denial of a maritime lien. It follows that the legal fiction by which the ship is held to answer for the torts of her officers and crew has no place in a proceeding against the United States under the act.

It seems unlikely that Congress would intentionally burden the national defense by making the public treasury answerable in damages for injuries caused by members of the naval forces in the performance of their duties, even though the duties be negligently performed. But if it did decide to give up its sovereign immunity to this unprecedented extent we think that it would do so directly in clear and unequivocal language and would not seek to achieve the result in any such obscure and circuitous way as is involved in the statutory construction urged upon us by the libellant. We cannot think that in authorizing an action in personam against the United States for damages caused by a public vessel Congress intended to refer to "public vessel" in the sense of a fictional personality responsible for damages caused by her officers and crew, and thus by implication to impose upon the United States liability for such damages as if caused by the personalized vessel, merely because in a wholly different kind of proceeding,— an action in rem against a private vessel to enforce the lien for a maritime tort,— the admiralty has for perfectly valid reasons not here present thus personalized the vessel.

Turning to the averments of the libel it is clear that the YP 249 was not the "noxious instrument" which physically caused the injury to the Cavelier. The physical cause was the submerged wreck. Libellant's complaint in reality is of the negligence of the navigating officers of the YP 249, whose directions the Cavelier was following. Its grievance would have been no different if those officers had directed the course of the Cavelier from her own bridge instead of from the bridge of the YP 249. The latter vessel, as a physical instrumentality, had no part in the matter. The United States, however, has not consented to be sued generally for damage resulting from the negligence of its naval personnel but only when by reason of such negligence a public vessel causes the damage. It follows that the district court was right in dismissing the libel for want of jurisdiction.

The decree of the district court is affirmed.

BIGGS, Circuit Judge (dissenting).

The majority opinion lays too great an emphasis upon the necessity of physical contact, such as that which ordinarily occurs in a collision, between the offending vessel and the injured vessel. This is demonstrated by the fact that the majority conceive of those decisions in which it has been held that a ship is entitled to damages for injuries sustained because she has run upon a jetty to avoid collision with another vessel or injuries have resulted to her because of swells caused by an offending vessel as an extension of waiver of immunity by the United States. See The Harding Highway, 3 Cir., 53 F.2d 938; Coastwise Transp. Corp. v. United States,

D. C., 43 F.2d 401. It is also shown by the fact that the majority rely to a considerable extent upon the decisions in such cases as The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, and The Vera Cruz (No. 2), [1884] 9 L.R.Prob.Div. 96. The resulting narrow construction placed upon the statute sub judice effects an injustice in the case at bar.

The Suits in Admiralty, Merchant Vessels, Act of March 9, 1920, c. 95, 41 Stat. 525, 46 U.S.C.A. § 741–752, and the Public Vessels Act of March 3, 1925, c. 428, 43 Stat. 1112, 46 U.S.C.A. §§ 781–790, must be construed in pari materia. State of Maine v. United States, D.C., 45 F.Supp. 35, affirmed 1 Cir., 134 F.2d 574; Coastwise Transp. Corporation v. United States, D. C., 43 F.2d 401.[1] I think that it was the intention of Congress in passing the Acts to put the United States on the same basis (libels in rem aside) as the private shipowner. While the suits authorized by the Acts must be brought against the United States by libels in personam, Congress intended to embrace within the scope of the Acts the kind of suits which could have been maintained by a libel in rem against a privately owned vessel as well as the kind of suits which could have been maintained by a libel in personam against the private owner of a ship because of the acts of his officers or crew. Section 2 of the Merchant Vessels Act provides this specifically and both Acts require substantially similar construction. See Benedict on Admiralty, Knauth's Sixth Edition, Vol. 1, Section 193. It should be noted that Section 3 of the Merchant Vessels Act provides that " * * * suits shall proceed and shall be heard and determined according to the principles of law and to the rules of practice obtaining in like cases between private parties." This admonition relates not only to procedure, but provides also the substantive remedies which would be available in admiralty against a private party. Section 2 of the Public Vessels Act provides that suits brought under it "shall be subject to and proceed in accordance with the provisions of [28 United States Code

Annotated 741–752, The Suits in Admiralty Act] * * *, in so far as the same are not inconsistent * * *." It would seem that these words bring the provisions of the Merchant Vessels Act into the Public Vessels Act. They are not merely of procedural effect but give the libellant the same rights under the Public Vessels Act (libel in rem aside) which he would have against a private person or a vessel privately owned. While the Acts prevent the private person from securing a maritime lien, it does not follow as the majority assert that " * * * the legal fiction by which the ship is held to answer for the torts of her officers and crew has no place in a proceeding against the United States under the [Public Vessels] act."

The libellant in the case at bar is entitled to maintain its cause of action against the United States under the Public Vessels Act for it alleges negligence on the part of the officers of the patrol boat YP 249 in operating the vessel, and, personifying the patrol boat in accordance with the usual admiralty fiction, negligence on the part of the patrol boat herself. The majority seem to conclude that in order to maintain a suit under the Public Vessels Act the offending United States vessel, as a "noxious instrument", must have come into direct physical contact with the injured ship, must have set physical forces in motion (such as swells) which came into physical contact with another vessel, injuring her, or the injured vessel must have been damaged in an attempt to avoid direct physical contact with the offending ship. I think these views are not assisted by the authority of The Osceola and The Vera Cruz (No. 2) supra. The provisions of Section 1 of the Public Vessels Act are broader than those of the Wisconsin statute, R.S. 1898, Section 3348, which was before the Supreme Court in The Osceola, as they are likewise broader than those of the English Admiralty Court Act of 1861 which was sub judice in The Vera Cruz. The English Admiralty Court Act used the words "damage done by any ship", a phrase narrower in scope than that of

[1] Mr. Chief Justice Stone, then Attorney General, in a letter dated April 8, 1924, stated to the Chairman of the Committee on Claims, House of Representatives, in respect to the original bill, H. R. 6989 (hereinafter discussed in this opinion), "The proposed bill intends to give the same relief against the Government for damages caused by collision by its public vessels * * * as is now given against the United States in the operation of its merchant vessels, as provided by the suits in admiralty act of March 9, 1920."

the Public Vessels Act which gives a cause of action for "damages caused by a public vessel of the United States". The Wisconsin statute sub judice in The Osceola used substantially similar language. Moreover, in The Osceola the court was passing upon the right of a seaman to recover damages for injuries sustained while he was upon his own vessel and in The Vera Cruz the administratrix of the master of the ship Agnes sought to recover damages for his death when his ship was run down by The Vera Cruz. The ratio decidendi of The Osceola lies in the statement by Mr. Justice Brown, 189 U.S. at pages 176, 177, 23 S.Ct. at page 487, 47 L.Ed. 760, that "The statute was doubtless primarily intended to cover cases of collision with other vessels or with structures affixed to the land, and to other cases where the damage is done with the ship herself, as the offending thing, to persons or property outside of the ship, through the negligence or mismanagement of the ship by the officers or seamen in charge. To hold that it applies to injuries suffered by a member of the crew on board the ship is to give the act an effect beyond the ordinary meaning of the words used. * * * In the case under consideration the damage was not done by the ship in the ordinary sense of the word, but by a gangway, which may be assumed to be an ordinary appliance of the ship, being blown against the libellant by the force of the wind." In The Vera Cruz the judges of the Court of Appeal adhered very strictly to the language of the Admiralty Court

Act, the Master of the Rolls in his opinion emphasizing the words "done *by* a ship". In view of the fact that the master of the Agnes lost his life because he was thrown into the killing element, the water, by the impact of the Vera Cruz upon the Agnes, the decision must rest upon the precise terms of the statute.

The legislative history of the Public Vessels Act in my opinion does not support the majority view. The original bill, H.R. 6989, dealt specifically with "collisions". Naturally the correspondence from executive officers of the government and others used the words "collision" or "collisions" in discussing the proposed measure. Referred to the Committee on Claims of the House of Representatives, H. R. 6989 died. H.R. 9535 was then introduced, containing the broad language of the Act sub judice. Senator Bayard stated that this bill was designed to take care of "all" claims "caused by reason of the shortcomings of a United States ship." See note 2, infra.

The Public Vessels Act like the Merchant Vessels Act was designed to lift from the shoulders of Congress the many and harassing claims arising out of the negligent operation of ships owned or operated by the United States and to substitute therefor actions in the District Courts of the United States subject to the conditions stated.[2] Negligent operation of United States vessels may cause damage to ships in other ways than those indicated by the majority as being within the purview of the Act. Recovery by the in-

---

2 Senator Bayard stated:

"Mr. President, the Senator from Arkansas is quite right; it is a measure of great importance. There are continuous applications being made to the Claims Committee of both Houses for the consideration of bills to reimburse people who have suffered damage from maritime accidents in which United States vessels are concerned, to enable them to present their suits in the various district courts. In this last Congress there were nearly 200 such claim bills introduced in the two Houses.

"Outside of that, there are many claims which must be settled by the Department of State, because our own nationals are forbidden going into our own Courts, and the nationals of other countries cannot come in, and this bill is to remedy that situation. It would give a person aggrieved because of an accident by reason of the shortcomings of a United States ship the right to go into a district court and prosecute his action." Senator Robinson stated: "If enacted, it would relieve Congress of the consideration of a great many measures in the nature of private claims." Senator Bayard replied: "All claims of this nature." Congressional Record, 68th Congress, 2nd Session, February 12, 1925, p. 3560.

In the House of Representatives, Mr. Underhill, who introduced and sponsored H. R. 9535, stated:

"The bill I have introduced simply allows suits in admiralty to be brought by owners of vessels whose property has been damaged by collision or other fault of Government vessels and Government agents." Congressional Record, 68th Congress, 2nd Session, January 19, 1925, p. 2087.

jured ship was not limited by Congress to such a narrow scope.

The decision of the majority does not overrule the decision of this court in The Harding Highway, supra, but their conclusions avoid the ruling of that authority. In the cited case the United States was held liable because a government dredge operated by the Engineer Corps of the United States Army crowded The Harding Highway, a ferry, into a stone jetty at the mouth of the Christiana River. There was no direct contact, but improper handling of the dredge clearly caused the accident because it put the ferry in fear of a collision and in endeavoring to escape that danger she hit the jetty. In Coastwise Transp. Corporation v. the United States, supra, the United States was held liable because a government tug towed a vessel to the ground in Portsmouth Harbor. In McCormack Sand & Gravel Corporation v. United States, D.C.E.D.N.Y., 1938 A.M.C. 1569, the United States was held liable because the destroyer Dahlgren by excessive speed caused the tow of the Dauntless to "pound" thus causing damage to the scows. In all three of these cases recovery properly was had under the Public Vessels Act. None of them is a doubtful case. They are decisions in which the provisions of the statute were applied with due regard for the background of fact.[3]

If I am correct in my conclusion that it was the intention of Congress to impose on the United States the same liability (libel in rem aside) as is imposed by the Admiralty law on the private shipowner, the authorities which would support a judgment in favor of the libellant are legion. See The Kronprinzessin Cecilie, 2 Cir., 192 F. 27; The Campania, 2 Cir., 203 F. 855; The Washington Irving, 2 Cir., 250 Fed. 797; The Luke, D.C., 19 F.2d 923, affirmed Jacobus-Grauwmiller Co. v. Alexander Hamilton, 2 Cir., 19 F. 2d 925; The J. C. Hart, D. C., 43 F.2d 566; The Favorita, D. C., 43 F.2d 569. See also The Lyndhurst, D.C., 92 F. 681, in which a tug at night turned her tow adrift without proper lights. Her tow came into collision with another tug. The first tug was held to be at fault in rem for leaving her tow without lights. This is the equivalent of saying that she was at fault in rem because those in charge of her failed to light the tow.

The decision of the majority is incompatible even with the narrow view of the statute which they adopt. They would allow recovery if injury is caused to a vessel by reason of her movements in an

---

[3] Compare the two decisions of the Circuit Court of Appeals for the Second Circuit, relied on by the majority. These cases, in my opinion, were also decided correctly on their facts.

In O'Neal v. United States, D.C., 11 F.2d 869, 870, affirmed 2 Cir., 11 F.2d 871, suit was brought by a seaman for recovery of damages for injuries sustained by him on board his own vessel from the explosion of a shell in the hands of a gunner's mate. Judge Campbell stated that Congress by enacting the Public Vessels Act "clearly did not intend to overturn the government's established policy, and permit its employees to bring actions for damages received on government ships in the course of their employment, * * *." Judge Campbell did go on to say that Congress intended by the use of the words damages "caused by a public vessel" to effect the same meaning as the English Courts gave to the words "done by any ship", but in view of the earlier portion of his ruling the latter statement seems to me to be pure dicta. The Court of Appeals for the Second Circuit affirmed the judgment in a per curiam opinion.

In Dobson v. United States, 2 Cir., 27 F.2d 807, suits had been brought by the representatives of naval officers who lost their lives on board a United States submarine while in the performance of their duty as the result of a collision between a steamship and the submarine. Judge Campbell had dismissed the libels on the authority of O'Neal v. United States, supra. See Haselden v. United States, D.C., 24 F.2d 529. In his opinion in the Circuit Court of Appeals Judge Swan stated, 27 F.2d at pages 808, 809, "Nevertheless the construction contended for by [the libellants] involves so radical a departure from the government's long-standing policy with respect to the personnel of its naval forces that we cannot believe the act should be given such a meaning. The statute itself does not specify who may maintain suits under it. To allow suit by the officers and crew of the public vessel for damage caused by it to them would be too great a reversal of policy to be enacted by such general terms." He then cited The Osceola and quoted a part of the opinion in that case which I have quoted above.

attempt to escape collision, but not if the injury occurs because the injured ship is compelled to follow a lead vessel which leads her into an obstruction. In other words, if the complaining vessel is injured because in fear of collision she runs aground, she may recover (The Harding Highway); but if, because she is impelled by a lead vessel to run into an obstacle in a channel, she may not recover (the case at bar). The distinction seems to lie only in a difference in motivation of the injured vessel's movements and in nothing more substantial.

But apart from the foregoing the Cavelier, as has been stated, was in convoy. She had been ordered to follow directly astern of the YP 249. She obeyed these orders. Had she not done so, the Cavelier, herself, her officers and owners might have been subject to heavy penalties. The Cavelier, therefore, for all practical purposes, was as firmly fastened to the stern of the YP 249 as if she had been in tow. The accident occurred because the YP 249 led the Cavelier over the submerged wreck. True the submerged wreck caused the damage, but the instrument was the YP 249 which "pulled" the Cavelier into the dangerous obstacle. Compare these facts with those of Coastwise Transp. Corporation v. United States, supra. The majority state that the YP 249 "* * * as a physical instrumentality, had no part in the matter." This seems to me to be clearly an incorrect conclusion on the facts. The Cavelier followed the stern of the YP boat; the YP boat therefore was a physical instrumentality just as is the lantern which leads one down a path at night. Compare the tortious use of the dredge in The Harding Highway.

The majority also express the view that the situation presented by the circumstances of the case at bar is substantially the same as if the officers of the YP 249 had directed the course of the Cavelier from her own bridge instead of from the bridge of the YP 249. I cannot agree. The Cavelier followed the YP boat as she was compelled to do. The officers of the YP boat were upon the bridge of their own vessel and not on the bridge of the Cavelier.

For the reasons given, I must respectfully dissent from the majority view.

The judgment should be reversed.